## In re O'CONNOR.

JURISDICTION. *Of state over places ceded to U. S. extinguished only by act of congress.* (2) *State legislature cannot abdicate jurisdiction.* (3) *When title is not in U. S., but in corporation, jurisdiction of state courts unimpaired.* (4) *Arrest of inmate of Soldiers' Home thereat on warrant from state court lawful.* (5) *Although he is subject to articles of war.*

1. The power of congress "to exercise exclusive legislation" over "all places purchased by the consent of the legislature of the state in which the same shall be," for the purposes mentioned in the 16th clause of sec. 8, art. I of the federal constitution, is limited to places *the title to which is vested in the United States* with such consent of the legislature; and even as to such places the jurisdiction of the state to enforce its laws and punish crimes continues until congress has, by some further legislative act, extinguished the state authority and vested exclusive jurisdiction over such places in the federal courts.

2. The state legislature has no power to abdicate the jurisdiction of the state over places within its limits, except where the title to them has been acquired by the United States.

3. The title to the premises occupied by the "National Home for Disabled Volunteer Soldiers," in this state, is *not in the United States,* but in a corporation created by congress; and although the legislature of this state attempted to cede to the United States jurisdiction over said premises (ch. 275, P. & L. Laws of 1867), the jurisdiction of the proper state courts over them remains unimpaired.

4. A person duly charged before the municipal court of the city and county of Milwaukee, with an offense against the laws of this state, was arrested, upon a warrant in due form, by the sheriff of that county. Upon his application for a discharge on *habeas corpus,* it appeared that he was an inmate of said Home, and was arrested while on duty within its limits, without any demand made upon the commandant. *Held,* that the arrest was lawful, and the petitioner not entitled to a discharge.

5. The facts that the inmates of said Home are, by act of congress, subject to the rules and articles of war, in the same manner as if they were in the army of the United States, and that the petitioner had been punished for his offense by the authorities of the Home, under the rules legally established for its government, do not affect the jurisdiction of the state court or the legality of the arrest.

CERTIORARI to the County Court of *Milwaukee* County,

to review proceedings had before the county judge upon the petition of *John O'Connor* for a writ of *habeas corpus.* The case is stated in the opinion.

*N. S. Murphy,* for the petitioner, argued, that the county court erred in holding that he could not go back of the warrant issued out of the municipal court upon which the petitioner was arrested. Although it appeared from the warrant that the offense charged was committed within the jurisdiction of the municipal court, yet the petition for the writ distinctly alleges that the offense was not committed in the city and county of Milwaukee, but within the exclusive jurisdiction of the National Home, and by and upon the inmates of the Home, who, by a public law of the land, were punishable for offenses committed in such jurisdiction by military trial by court martial under the rules and articles prescribed by congress for the government of the armies of the United States.

This allegation of the petition is not denied in the return to the writ. The question is, therefore, not so much one of territorial as personal jurisdiction. Counsel cited the acts of congress relating to the Home, and ch. 275, P. & L. Laws of 1867, ceding jurisdiction of lands occupied as the Home, or National Asylum, and insisted that exclusive jurisdiction is the necessary attendant upon exclusive legislation; that under the constitution of the United States the purchase of lands by the United States brought them within the exclusive legislation of congress, and thereupon state jurisdiction was completely ousted. *U. S. v. Cornell,* 2 Mason, 60. Asylums for disabled soldiers differ in no substantial sense from hospitals in a fortress or in the field. *Sinks v. Reese,* 19 Ohio St., 315. The act of congress, of Mar. 21, 1866, sec. 9, declares that the inmates of the Home shall be subject to the rules and articles of war. The 33d article of war provides that when any commissioned officer or soldier shall be accused of an offense punishable by the known laws of the land, the commanding officer of every regiment, troop, or company shall, upon application duly made, use their

utmost endeavors to deliver over such accused person. This provision changes the relation of the court to the accused. Application should be made for the delivery of the accused to his commander. Digest of Opinions of the Judge Adv. Gen'l, 10, 11; 2 Opin. Att'y Gen'l (Wirt), 11. *Ex parte Randolph*, 2 Brock., 447. In all hearings upon petition for this writ it is the duty of the officer to inquire into the cause of the imprisonment, and if found illegal for any cause to liberate the prisoner. R. S. 1858, ch. 158, sec. 20; 2 Tay. Stats., 1796; *People v. Tompkins*, 1 Parker's Crim. R., 224; *Ex parte Taylœ*, 5 Cow., 39; *People v. Martin*, 1 Parker's Crim. R., 187; *In re Prime*, 1 Barb., 351; *State v. Best*, 7 Blackf., 611; *In re Booth & Rycraft*, 3 Wis., 157; *In re O'Conor*, 6 id., 288; *In re Doyle*, 9 id., 264; *People v. Willett*, 6 Abb. Pr., 37; Hurd on Hab. Corp., 331.

COLE, J. The questions of law to be considered in this case arise upon the following facts, which are stated in the brief of the counsel for the petitioner.

· On the 4th day of May, 1874, the petitioner was an inmate of the National Home for Disabled Volunteer Soldiers, near the city of Milwaukee. On the same day, Samuel Hynes and Peter Manning were also inmates of the said National Home, which is located some three miles from the city of Milwaukee, in the town of Wauwatosa. On the 7th day of May, said Hynes made complaint to the municipal court of the city and county of Milwaukee, charging the petitioner and said Manning with having committed an assault and battery upon said Hynes, "at the city and county of Milwaukee," on the 4th day of May, 1874, and prayed that the said petitioner and the said Manning might be arrested and punished therefor. On the same day the clerk of said municipal court issued a warrant in conformity with the prayer of the complaint, and delivered the same to John F. McDonald, then sheriff of Milwaukee county, for service. On the 25th day of May, 1874, the sheriff, by virtue of said warrant, without making any demand of the commandant

of the National Home for Disabled Volunteer Soldiers, or any other person whomsoever, entered upon the grounds occupied by the Home, and arrested and carried away to the city of Milwaukee the petitioner, and thereafter confined him in the common jail of Milwaukee county, awaiting his trial, as was supposed, and where he was confined at the time of bringing his petition for a writ of *habeas corpus* before the county judge; and at the time of making said arrest the petitioner was on duty at the Soldier's Home, by order of the commanding officer thereof. The petition for the writ further represented that no assault or battery or other affray ever occurred between said Hynes, Manning or said O'Connor on said 4th day of May, or at any other time, in the city or county of Milwaukee; but that the same, if at all, occurred on the grounds and within the buildings of said National Home, on the 4th day of May, and not elsewhere, or at any other time, and that for such offense the petitioner had been duly tried and punished by the authorities of the United States at said National Home, pursuant to the rules and discipline legally established for the government of said Home.

The petition further represented that the cause or pretense of his confinement, according to his best knowledge and belief, was the warrant issued by the said municipal court, and that such confinement was illegal, as he was advised and believed, for the following reasons: First, that the petitioner could not be lawfully arrested, while so as aforesaid serving in the said National Home, by authority of a warrant alone, without a demand and information duly presented in writing, under oath, to the commanding officer for his information and decision. Second, because the alleged offense, if any was committed, was not committed in either the city or county of Milwaukee, but on the the grounds and within the buildings of said National Home, where said petitioner was only amenable to the rules and articles of war. Third, because the said petitioner had been tried and punished for said alleged offense by the au-

thorities of the said National Home, and that such trial and punishment was a bar to said proceedings in said municipal court instituted.

These facts were made to appear by the return of the sheriff to the writ and demurrers interposed thereto, as an inspection of the return of the county judge will more fully show. The county judge, upon the hearing and after argument, held that the warrant to the sheriff, being regular on its face and issued by a court of criminal jurisdiction over such offenses committed in Milwaukee county, was a sufficient protection to the sheriff to enter upon the grounds of the National Home and arrest the petitioner, without a previous demand from the commander of the Home to surrender the prisoner; and he thereupon ordered the petitioner to be remanded to the custody of the sheriff. From this determination of the county judge a writ of *certiorari* was sued out from this court, to review the proceedings had before him.

It is quite evident that the only important question arising upon these facts is, whether, if the alleged offense was committed on the grounds and within the buildings of the National Home, of which the petitioner was an inmate, the jurisdiction of the municipal court extends to it. It is not denied that the jurisdiction of that court is coextensive with the county of Milwaukee; but it is said that the National Home, the place where the offense was committed, was within the sole and exclusive jurisdiction of the United States, and therefore the municipal court can take no cognizance of it. The argument upon this point is briefly this: The grounds, it is insisted, where the National Home is situated, were purchased by'congress, by the consent of the legislature of this state, for a purpose contemplated by the sixteenth clause of the eighth section of the first article of the constitution of the United States, and therefore, by the very terms of the constitution, *ipso facto,*'they fall within the exclusive legislation of congress, and the state jurisdiction is completely ousted.

The provision of the constitution referred to gives congress the power to exercise exclusive legislation "over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings." On its face this provision would seem clearly to apply to a case where the lands were purchased by the United States, by the consent of the state, for one of the specific and enumerated objects, and where the title to the lands and ownership are in the United States. This is the natural and obvious meaning of the constitution, and the construction which, in the absence of all authority, we should confidently place upon it. The mode by which and the purpose for which land may be acquired or purchased within the limits of a state, by the United States as a sovereign power, are prescribed and pointed out. The purchase is made by the United States, the United States becoming the owner and proprietor of the soil for some purpose indicated in the provision; and this purchase must be ratified or consented to by the legislature, in order to give congress the exclusive power of legislating over it. When the purchase is made in this manner, and for such an object, then congress may, if it sees fit to do so, extinguish all state authority and jurisdiction over the place so acquired, and vest exclusive jurisdiction over it in the federal courts. *United States v. Bevans*, 3 Wheaton, 336; *The People v. Godfrey*, 17 Johns., 225; *Commonwealth v. Young*, Brightly's R., 302; *Commonwealth v. Clary*, 8 Mass., 72; *United States v. Cornell*, 2 Mason, 60; *United States v. Davis*, 5 id., 356; 1 Kent, 430; *Mitchell v. Tibbitts*, 17 Pick., 298; *United States v. Travers*, 2 Wheel. Crim. C., 490; *The People v. Lent*, id., 548. But the United States, as a mere proprietor of land situated within the limits of a state, which was acquired by purchase, without the consent of the legislature, has no paramount authority derived from ownership of the soil. *United States v. Ames*, 1 Wood. & Minot, 76. "The United States, holding lands within the state territory (unless in the cases specified by

the constitution), hold them by the same tenure that individuals do." DUNCAN, J., in *Commonwealth v. Young, supra,* 313. But when the land is purchased by the general government, by the consent of the legislature of the state, for some or one of the purposes mentioned in the constitution, then doubtless congress has the power to exercise exclusive legislation and jurisdiction over the place. And even in that case, if congress has not exercised its exclusive right of legislation over the place, the jurisdiction of the state to support and maintain its laws, and to punish crimes committed within its acknowledged limits, will be asserted and maintained. *United States v. Bevans ; The People v. Godfrey ; Commonwealth v. Young ; The People v. Lent.* Unless this were so, the most mischievous consequences would follow in a case where congress had not accepted the jurisdiction and legislated in reference to the place ; since it would leave a portion of the territory within the limits of the state free from the operation of all law, a sanctuary beyond the control of any human tribunal to punish the crimes there committed. Such a condition of things is not to be assumed except upon the clearest grounds. "The rights of sovereignty are never to be taken away by implication." SPENCER, C. J., in *The People v. Godfrey.*

Now, applying these remarks to the facts of this case, we have to inquire whether the purchase was made by the United States, the general government owning the property and taking the title with the consent of the legislature for one or any of the objects mentioned in the constitution. The nature of the institution or the corporation acquiring the property must be considered. And the first thing that strikes us, on this branch of the case, is, that the purchase was not made by the United States, but by a corporation, which owns and controls the property for the purposes of the trust. It is true, the corporation is one organized and created by an act of congress, and its board of managers is composed of the president of the United States, secretary of war and chief justice of the United States,

*ex officio*, during their terms of office, together with nine other members, who are selected by a joint resolution of congress from time to time, as vacancies occur.    These are constituted and established a body corporate, with certain powers, as a board of managers " of an establishment for the care and relief of the disabled volunteers of the United States army, to be known by the name and style of The National Asylum for Disabled Volunteer Soldiers." (14 U. S. Statutes, p. 10.) The board of managers have power to procure sites for military asylums at suitable places, and to erect necessary buildings thereon.    For the establishment and support of the asylum, certain fines, forfeitures and unclaimed funds in the treasury of the United States are appropriated; and the board is authorized to receive all donations of money or property made by any person for the benefit of the asylum.    These are all the provisions of the act which it is necessary to refer to, in order to show the character of the corporation.    And it will at once be seen that it is in the nature of a charity or eleemosynary corporation, under the perpetual guardianship of the United States, having power to purchase and hold real estate, and to apply certain moneys for the care, relief and support of discharged volunteer soldiers who served in the late war for the suppression of the rebellion, and were disabled by wounds received or sickness contracted in the line of their duty.    The corporation is in its nature and object a public charitable institution, worthy, doubtless, of public favor and of private munificence.    It is not, however, to be confounded with the general government; nor are its rights and property in any just, legal sense, the rights and property of the United States.    This view would seem to be so obvious as not to require any illustration or remark.    The title to the real estate authorized to be purchased, belongs to and is the property of the corporation.    The corporation only could maintain an action for a trespass upon it.    If one of the buildings were willfully burned by any one, an indictment for the arson would necessarily allege the ownership of the property in the corpora-

tion. These tests are deemed to be ample and sufficient to show that the lands purchased for the asylum, or National Home, were not acquired by the United States, but by a corporation, and that the provision of the constitution does not apply to the case. For " the right of exclusive legislation within the territorial limits of any state; can be acquired by the United States only in the mode pointed out in the constitution, by purchase, by consent of the legislature of the state in which the lands shall be, for the erection of forts, magazines, arsenals, dockyards, and other useful buildings." SPENCER, C. J., in the *People v. Godfrey.* "If in any case the United States have not actually purchased, and the state has not, in point of fact, ceded the place or territory to the United States, its jurisdiction remains." 1 Kent, *supra.* True, it appears that the legislature, by ch. 275, P. and L. Laws of 1867, attempted to cede to the United States jurisdiction over the lands upon which the National Home was to be located; but if the United States did not actually acquire these lands as a sovereign power, in the mode and for the purpose authorized by the constitution, this act of cession by the legislature is void. For it is not competent for the legislature to abdicate its jurisdiction over its territory, except where the lands are purchased by the United States, for the specific purposes contemplated by the constitution. When that is done, the state may cede its jurisdiction over them to the United States; and, should congress see fit to exercise its exclusive right of legislation over the place, the state jurisdiction would be completely ousted. In that event the state courts could not take cognizance of any offenses committed within the limits of such ceded territory; nor could the inhabitants of such territory exercise any civil or political privileges under the laws of the state, because not bound by those laws. *Commonwealth v. Clary; Same v. Young,* 1 Met., 580.

The view we have taken of the constitutional provision, and of the purchase made by the corporation, is directly in conflict with the decision of the supreme court of Ohio, in *Sinks v.*

*Reese*, 19 Ohio St., 306.    In that case the court held that a purchase of lands through the medium of this corporation for a site for the erection of buildings for the asylum should be regarded precisely in the same light as a purchase by the United States, and that the asylum was under the exclusive jurisdiction of congress, and that its inmates were not citizens of Ohio, so as to be entitled to vote under the state law.    If the court was right in the assumption that the case was the same as though the United States had made the purchase and taken the title, then its conclusion would seem to be irresistible.    For, if a resident and citizen of Ohio ceased to be such upon becoming a resident inmate of the asylum, then it would seem plain that he ought not to exercise any civil or political privilege under the laws of the state.    But our disagreement with that most able and enlightened court grows out of the fact that it treats a purchase made by the corporation the same as a purchase made by the United States.  With all proper respect, it seems to us that a wide distinction exists between the cases.    The corporation purchases the land, and owns and controls it as a charity.    It is not the property of the United States, and the purchase is not made by and for the general government.    The Ohio court say that there could be no reasonable question that congress had the power under the constitution of the United States, with the consent of the legislature, to purchase lands for the establishment of such institutions.    The power to declare war, and to raise and support armies, carries with it the incidental power to establish asylums for diseased and wounded soldiers; and these asylums, it is observed, differ in no substantial sense from hospitals in a fortress or in the field.    All this may be granted. Concede that congress could have acquired the lands where the National Home is situated, by the consent of the legistature of this state, and have established this institution for the care and support of disabled soldiers, and have excluded the state from all jurisdiction over the place and over its inmates.    But the question is, Has congress done this, or attempted to do it?

Congress has created a corporation with power to establish, manage and control such a charitable institution. Congress might, with the consent of the state, purchase land for an arsenal, and exercise full and absolute sovereignty over the ceded territory. But, suppose congress should incorporate a company with power to build and maintain an arsenal for the manufacture and storage of arms and other munitions of war, would the case stand upon the same ground, and would the implication arise that the state had lost jurisdiction over the arsenal belonging to the corporation? "It is a fundamental principle," says C. J. SPENCER, in the remark already quoted, "that the rights of sovereignty are never to be taken away by implication;" and we are not to assume that the state has lost its general jurisdiction over all places within its limits, until that fact is made to appear in a satisfactory manner. For these reasons we are unable to adopt the view of the supreme court of Ohio in holding that the inmates of the National Home are subject to the exclusive jurisdiction of another power, and that the municipal court of Milwaukee county has no cognizance of an offense alleged to have been committed in that place.

But the counsel for the petitioner furthermore insisted that the question presented was one of personal rather than of territorial jurisdiction. The inmates of the Home, it is said, are made by the act of congress subject to the rules and articles of war, and are governed thereby in the same manner as if they were in the army of the United States. It seems to me that this does not essentially affect the question we have been considering, which is, whether the grounds and buildings of the National Home, the place where the alleged offense was committed, are within the jurisdiction of the state. If the petitioner has been punished by another competent tribunal, this may constitute a good reason why he should not be further prosecuted. But this is obviously a matter of defense. It fails to establish the position that the jurisdiction of the state does not extend to and operate within that territory.

It was also claimed that it was not competent to arrest the petitioner on the warrant without first presenting to the commanding officer a sworn statement of the facts concerning the alleged offense, for his information and decision, and that this is the invariable practice in all such cases.    It might have been an act of courtesy, and a very proper thing for the sheriff to have done, to have informed the commanding officer of the charge made against one of the inmates of the institution ; but surely, as it seems to us, this is not a matter which goes to the jurisdiction of the court issuing the process, nor does it affect the duty of the sheriff to execute his writ.    In the case of the *People v. Godfrey*, the prisoner and deceased were in the service of the United States when the murder was committed, and the sentence of death was carried into execution.    By the 33d article of war, when any commissioned officer or soldier shall be accused of a capital crime, or of having used violence or committed any offense against the person or property of any citizen of the United States, such as is punishable by the known laws of the land, it is made the duty of the commanding officer of the regiment or company to which the person so accused shall belong, upon application made by or in behalf of the party injured, to use his utmost endeavors to deliver over such accused person to the civil magistrate, and to aid the officers of justice in apprehending and arresting the person accused, in order to bring him to trial.    Brightly's Digest, p. 76.

Doubtless the commanding officer of the National Home would have felt the same obligation imposed by this article to cooperate with the civil officers in apprehending and securing the accused petitioner for trial, had a demand been made upon him.    To suppose that he would not have been willing to aid in making such arrest, would be to impute to him conduct inconsistent with his duty.

In any aspect in which we have been able to view the case, it seems to us the order of the county judge was correct and must be affirmed.

*By the Court.* — Order affirmed.