In re KELLY.

(Circuit Court, E. D. Wisconsin. December 27, 1895.)

1. JURISDICTION—LANDS CEDED TO THE UNITED STATES—SOLDIERS' HOMES.

The purchase of lands in a state by the general government, with legislative consent, does not, ipso facto, confer upon the general government exclusive jurisdiction, unless the purchase is for a fort or for some other purpose distinctly named in article 1, § 8, of the constitution; and in order that exclusive jurisdiction may be acquired over land taken for any other purpose, the act providing therefor and calling for the consent must unequivocally declare that exclusive jurisdiction is intended and necessary, or such necessity must be manifest from the purpose of the act. Accordingly, *held*, that the acts of congress establishing the National Home for Disabled Volunteer Soldiers, and creating a corporation authorized to take and hold lands for the purposes of such homes, containing no declaration of the necessity of exclusive jurisdiction in the general government over such lands, do not vest such exclusive jurisdiction in the United States, upon the consent of the state being given to the acquisition of such lands.

2. SAME.

*held*, further, that a cession to the general government, in the act giving the consent of the state to the purchase of such land, of "jurisdiction," does not confer exclusive jurisdiction, the purpose of the act not requiring it, but such jurisdiction only, concurrent with that of the state, as congress may find necessary for the objects of the cession.

3. SAME—CRIMINAL LAWS.

*Held*, further, that, upon lands so ceded for the purpose of a home for disabled volunteers, the criminal laws of the United States, which apply only to places within their exclusive jurisdiction, are not operative.

## Application for Writ of Habeas Corpus.

The petitioner, Thomas Kelly, stands committed for trial upon mittimus, issued by the commissioner of this court, upon the charge that, on October 29, 1895, he assaulted, with a dangerous weapon, one Patrick Coghlan, with intent to kill and murder, at Northwestern Branch National Home for Disabled Volunteer Soldiers, "a place ceded to, and then and there being within the exclusive jurisdiction of, the United States," and in said district, in violation of section 5391, Rev. St. U. S. The place of the alleged offense is within the boundaries of Milwaukee county, in the state of Wisconsin, and is the locality referred to and described in chapter 275 of the Private and Local Laws of Wisconsin for 1867, entitled "An act ceding jurisdiction to the United States over certain lands in Milwaukee county, state of Wisconsin, and to exempt said lands from taxation," which provides as follows:

"Section 1. That jurisdiction over the several tracts of land hereinafter mentioned, be and hereby is ceded to the United States of America, to wit: All those certain tracts of land in sections twenty-six (26) and thirty-five (35) purchased by the United States of America for the purpose of locating a 'National Asylum for Disabled Volunteer Soldiers,' said several tracts of land lying and being situate in townships seven (7) north, of range twenty-one (21) east, in the town of Wauwatosa, in the county of Milwaukee and state of Wisconsin, and including all other tracts or parcels of land which shall be hereafter acquired or purchased by the United States for the purpose aforesaid; and all such lands and other property connected with said asylum are hereby exempted from taxation for any state or local purpose whatever; provided, that civil or criminal process issued from courts in the state of Wisconsin may be served within the territory hereby ceded."

The record upon this hearing tends to show serious assault by the petitioner, an inmate of this national home for disabled volunteer soldiers, upon another inmate, and within the buildings erected and maintained for the home. This institution is one established under the provisions of an act

of congress, approved March 21, 1866 (chapter 21, 14 Stat. 10), entitled "An act to incorporate a national military and naval asylum for the relief of the totally disabled officers and men of the volunteer forces of the United States," and of acts amendatory thereof, including one of 1873 (chapter 51, 17 Stat. 417), which substituted the term "home" for "asylum." These acts established a corporation under the name of the "National Home for Disabled Volunteer Soldiers," constituted of a board of managers, which included the president, secretary of war, chief justice, and nine other members, elected by congress. Among the powers conferred they have perpetual succession; may take, hold, and convey real and personal property; "may make by-laws, rules, and regulations, not inconsistent with law, for carrying on the business and government of the home, and affix penalties thereto." Rev. St. §§ 4825, 4826. They are empowered to appoint a governor and other officers for such home, procure sites, and erect buildings. Certain fines and stoppages of pay against officers and soldiers are appropriated, and the board are authorized to receive donations for the benefit of the home. All inmates are "subject to the rules and articles of war, and in the same manner as if they were in the army." Rev. St. §§ 4829–4835. The grounds in question occupied by this Northwestern Branch were purchased by, and the title taken to, the corporation, under the authority of the acts of congress referred to. Therefore, title is not, at least nominally, vested in the United States, but the means for the purchase and for the erection of the buildings were furnished by congressional appropriations, and support and maintenance has come mainly, if not wholly, from the same source.

Rublee A. Cole, for petitioner.

J. H. M. Wigman and F. P. Van Valkenburgh, for respondent.

SEAMAN, District Judge (after stating the facts as above). The courts of the United States are peculiarly of limited jurisdiction in criminal cases. Common-law crimes, as such, against the general government do not exist, and the judicial power can be exercised only over offenses which are declared and "made punishable by the constitution, laws, or treaties of the United States," resorting to the common law, when necessary, "for the definition of terms by which offenses are designated." Pettibone v. U. S., 148 U. S. 197, 203, 13 Sup. Ct. 542. This view of the absence of a common-law jurisdiction, and that the cognizance of the federal courts respecting crimes was confined to acts which were made criminal by the legislative authority of the Union, was pronounced by the supreme court in the early case of U. S. v. Hudson, 7 Cranch, 32, and the doctrine has been constantly maintained by that court, although frequently assailed there and questioned by text writers. In that case it is further asserted that the same authority must "declare the court that shall have jurisdiction of the offense." The crime with which the petitioner is charged is not specifically designated in any act of congress, but it is alleged as in violation of section 5391, Rev. St. U. S., which reads as follows:

"Sec. 5391. If any offense be committed in any place which has been or may hereafter be, ceded to and under the jurisdiction of the United States, which offense is not prohibited, or the punishment thereof is not specially provided for, by any law of the United States, such offense shall be liable to, and receive the same punishment as the laws of the state in which such place is situated, now in force, provide for the like offense when committed within the jurisdiction of such state; and no subsequent repeal of any such state law shall affect any prosecution for such offense in any court of the United States."

This provision was originally adopted in an act of March 3, 1825, and now appears as the concluding section of chapter 3 in title 70 of the Revised Statutes. The general title is "Crimes." Chapter 3 is entitled, "Crimes Arising within the Maritime and Territorial Jurisdiction of the United States," and its provisions are clearly confined to offenses committed (1) "within any fort, arsenal, dock-yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States"; or (2) upon the high seas or in the waters "within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular state." Sec. 5339. The section involved here relates to the first-mentioned class, and it is manifest, both from its terms and its context, that it intends cognizance only of crimes committed in places within the exclusive jurisdiction of the United States. The strictness of construction to be applied in such case is clearly stated in U. S. v. Bevans, 3 Wheat. 336. The sole inquiry, therefore, on this application, is whether the place of the alleged offense has been acquired and appropriated by the United States in the manner and for a purpose which confers exclusive jurisdiction. The objection was urged at the bar, on behalf of the petitioner, that this section is unconstitutional or inoperative, because the definition and punishment of offenses was made wholly dependent upon state enactments then existing, but I deem the provision unexceptionable in that regard. The state laws thus made applicable are in effect adopted by congress for the localities respectively. Ex parte Siebold, 100 U. S. 371, 388.

The question thus presented is important, and merits careful consideration. There are decisions, in various state courts of eminence, which stand in apparent conflict respecting the character and extent of the national jurisdiction over the sites of these national homes, and the determination here is of special difficulty and delicacy by reason, on the one hand, of direct adjudication by the supreme court of Wisconsin (In re O'Connor, 37 Wis. 379) that the state jurisdiction exists over the site in question for the punishment of crimes, notwithstanding the purported cession by the legislature in chapter 275, P. & L. Laws 1867, and, on the other hand, of opinions by the highest courts of Ohio and Virginia, respectively, that the federal jurisdiction over a place vested in the same national corporation for like purpose is exclusive; and by the further fact, mentioned in the opinion filed by the commissioner herein, that jurisdiction has heretofore been exercised in this court over crimes committed on this Wisconsin site, although the question now presented does not appear to have been raised. In the Case of O'Connor, Mr. Justice Cole (afterwards chief justice) delivers the unanimous opinion of the supreme court of Wisconsin, which then included Chief Justice Ryan and Associate Justice Lyon, and it was held, in substance, that because the land was not purchased or acquired directly by the United States, but by this corporation, it was not within the provisions of the clause of the federal constitution under which exclusive jurisdiction must arise, and that the

legislative act of 1867, purporting to cede jurisdiction to the United States, was therefore void, as "it is not competent for the legislature to abdicate its jurisdiction over its territory, except when the lands are purchased by the United States for the specific purpose contemplated by the constitution." This decision was delivered in 1875, upon certiorari to the county court of Milwaukee county, in review of proceedings for a writ of habeas corpus to release the petitioner from prosecution in the state court for an assault committed at this national home, all the parties being inmates, and the petitioner showing that he had been tried and punished for the offense by the authorities of the home, pursuant to the rules and discipline there established. The opinion carefully reviews and distinguishes the authorities, and disapproves Sinks v. Reese, 19 Ohio St. 306, which is recognized as conflicting. In Clarke v. Milwaukee Co., 53 Wis. 65, 9 N. W. 782, the same tribunal in effect reaffirms the doctrine of the former case.

The Ohio supreme court, in the earlier case of Sinks v. Reese, supra, had the question before it in determining an election contest which involved the legality of votes cast by inmates of the similar national home located in that state, and the conclusion is there pronounced that a legislative consent and cession of jurisdiction to the United States operated to fix "the exclusive jurisdiction of the general government over this institution, its lands, and its inmates," and that "by becoming a resident inmate of the asylum, a person, though up to that time he may have been a citizen and resident of Ohio, ceased to be such," and became "subject to the exclusive jurisdiction of another power," and could not exercise the elective franchise. The fact that the title of the grounds was vested in the corporation, and not directly in the United States, was held immaterial. The only feature of this Ohio act of cession upon which a distinction from the Wisconsin act can be noted, so far as concerns this inquiry, is that the former expressly recites that the lands are to be "acquired by donation or purchase by the managers of the national asylum" for the uses and purposes thereof, while the Wisconsin act mentions only land "acquired or purchased by the United States for the purpose."

In Virginia the supreme court of appeals considered this question of exclusive jurisdiction, in 1886, in the case of Foley v. Shriver, 81 Va. 568, respecting the national home at Hampton, in that state. That was an action of foreign attachment against Shriver, in which the corporation, the National Home for Disabled Volunteer Soldiers, was sued and served as garnishee upon its indebtedness to the principal defendant. The opinion discusses the effect of the state act of cession to the United States, in connection with the fact that title was in the corporation for the purposes of the act of congress, and thereupon says: "The United States have acquired, under the federal constitution, exclusive jurisdiction over the ceded lands, and they are no longer a part of the state of Virginia, and are not subject to the jurisdiction of the state courts;" that persons residing there are not citizens of the state; and that the suit was

therefore without jurisdiction. But it concludes with a further ruling, which seems unexceptionable and decisive, that the home and its officers are disbursing officers of the United States government, and, as such, cannot be reached by garnishee process. It is noteworthy that the act of cession upon which this opinion is founded is there described as containing, in the preamble, a recital of the purpose of the board of managers of the home to locate a branch within the state, upon which expenditures would only be made when the property was placed under the control of the general government, and in its enacting clause a grant of legislative consent and a cession of "such jurisdiction to the United States over this tract as is within the contemplation of the seventeenth clause of the eighth section of the first article of the constitution."

In the face of these conflicting adjudications the issue must be determined as one of first instance in the federal courts, so far as I am advised. The nature of the subject, involving powers and rights of the United States under the constitution and laws, demands of this court the exercise of an independent judgment. Therefore the Wisconsin decision can have persuasive force only, and is not conclusive, as the petitioner contends.

The constitutional provision under which the claim of exclusive jurisdiction is asserted declares: "Congress shall have power to exercise exclusive legislation in all cases whatsoever over such district" as may become the seat of government, "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings." Article 1, § 8. It is well settled that there must be an actual purchase for the purpose by the United States, and consent by the legislative authority of the state, as conditions precedent to the operation of this provision; that thereupon all jurisdiction is ceded, and passes to the general government, and, aside from an unqualified consent, no declaration or enactment of cession upon the part of the state is requisite or material; that any title of the United States acquired otherwise within a state, however long continued, and for whatever purpose employed, confers only the rights of proprietorship, and is not within the terms of this provision; that, therefore, any exclusion of state interference must depend upon powers and rights arising outside of that provision. Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995; Railroad Co. v. McGlinn, 114 U. S. 542, 5 Sup. Ct. 1005. The rule thus stated, whereby legislative consent operates as a complete cession, is applicable only to objects which are specified in the above provision, and cannot be held to so operate, ipso facto, for objects not expressly included therein. Whether it rests in the discretion of congress to extend the provision to objects not specifically enumerated, although for national purposes, upon declaration as "needful buildings," and thereby secure exclusive jurisdiction, is an inquiry not presented by this legislation; and I think it cannot be assumed by way of argument that such power is beyond question. In New Orleans v. U. S., 10 Pet.

662, 737, the opinion of the supreme court is expressed by Mr. Justice McLean, without dissent, as follows:

"Special provision is made in the constitution for the cession of jurisdiction from the states over places where the federal government shall establish forts or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction."

And, in U. S. v. Bevans, 3 Wheat. 336, 390, the claim was urged that the words "other place" would include a ship of war of the United States lying at anchor in Boston Harbor, and bring it within the statute defining murder committed "within any fort, arsenal, dock-yard, magazine or in any other place or district of country under the sole jurisdiction of the United States"; but it was stated by the court, through Chief Justice Marshall, that "the construction seems irresistible that by the words 'other place' was intended another place of a similar character with those previously enumerated"; that "the context shows the mind of the legislature to have been fixed on territorial objects of a similar character." See, also, The Federalist, No. 43, by Madison.

. But, whatever may be the rule pronounced when that question arises, it appears indisputable that all state jurisdiction is not excluded from every parcel of land purchased by the general government in a state with legislative consent, irrespective of its use; and, therefore, that if the purpose is not one of those distinctly named in this clause of the constitution, the act of congress which provides for the purchase and requires the legislative consent must in some unequivocal terms declare that exclusive jurisdiction is intended and necessary for the proposed use, or at least the purpose stated must be one of which it is manifest that any exercise of co-ordinate or other jurisdiction would be incompatible therewith. The acts of congress which provide for these homes establish a great charity, in recognition of the obligation which the nation owes to the men who came to its service in the time of greatest peril, caring for them when they have become "disqualified for procuring their own support by reason of wounds received or sickness contracted while in the line of their duty." The object, the duty, and the enactments are distinctly of national character. The board of managers are incorporated to make purchases and receive appropriations or donations, to be vested with the title to all lands and property employed, and to manage the institutions as provided in the acts. They constitute, as well described in the opinion in Re O'Connor, supra, an "eleemosynary corporation under the perpetual guardianship of the United States"; and the means for their establishment and support are furnished mainly, although not exclusively, by appropriations from the national treasury. In no sense do these enactments intend works or establishments for the public safety or defense, or for military purposes; nor do they contain any declaration, or suggestion, even, of requirement or need of exclusive legislation over the lands purchased and employed for the homes; nor is there any provision which is incompatible with the operation of the civil and criminal laws of the locality aside from the regulations mentioned. While

the acts of congress establishing national cemeteries have a declaration (section 4882, Rev. St.) that the sites therefor shall be taken under the constitutional provision above cited, and require that cession of jurisdiction be obtained accordingly, any such reference or requirement is not found in the national home acts. Furthermore, beyond the want of affirmative showing of any congressional intention to secure exclusive jurisdiction, there are provisions which strongly tend to show that it was neither intended nor wanted, viz.: (1) In having the legal title of lands purchased for homes vested in the corporation, instead of in the United States, where it would naturally have been placed if the constitutional requisite were in view,—a feature which was held fatal to the application of that provision in the O'Connor Case, and which renders its application at least doubtful under the strict interpretation of the Ft. Leavenworth Case, supra. (2) In the congressional enactment of January 21, 1871 (16 Stat. 399), which promptly met the effect of the decision in Sinks v. Reese, supra, by restoring state jurisdiction under a provision that the lands of the Ohio branch "are hereby ceded to the state of Ohio and relinquished by the United States." I am therefore of opinion that this clause of the constitution, upon which the Ohio and Virginia decisions mainly rest their view of the state enactments, respectively, is not applicable to this Wisconsin case, and cannot be invoked to exclude the exercise of state jurisdiction over the crime charged against the petitioner, and this position is well fortified by the following authorities: United States v. Bevans, 3 Wheat. 336; New Orleans v. U. S., 10 Pet. 662, 737; Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995; Railroad Co. v. McGlinn, 114 U. S. 542, 5 Sup. Ct. 1005; People v. Godfrey, 17 Johns. 225; Crook, Horner & Co. v. Old Point Comfort Hotel Co., 54 Fed. 604.

Another question remains for consideration which has impressed me as presenting the greatest difficulty, namely, how far the act of the Wisconsin legislature (chapter 275, P. & L. Laws 1867) can be regarded as ceding or conferring jurisdiction beyond the terms of the constitutional provision. This act provides "that jurisdiction over the several tracts hereinafter mentioned be and hereby is ceded to the United States of America." It then describes the lands, and refers to such other tracts as may be acquired, and recites that they are "purchased by the United States for the purpose of locating a national asylum," etc. In the O'Connor Case, supra, the supreme court of Wisconsin declares the act void, upon the ground that the lands were acquired by a corporation, and not by the United States as a sovereign power, and holds that "it is not competent for the legislature to abdicate its jurisdiction over its territory, except when the lands are purchased by the United States for the specific purposes contemplated by the constitution." If this proposition is considered as declaring broadly that there must be an actual purchase, as well as a use for one of the purposes specified, before the legislature could make the cession to the general government,—in other words, that it could only

yield jurisdiction where this constitutional provision was operative, —the decisions of the United States supreme court in the Ft. Leavenworth Cases, supra, and in Benson v. U. S., 146 U. S. 325, 13 Sup. Ct. 60, would disapprove that doctrine. It is there determined, especially in Benson v. U. S., that although the Ft. Leavenworth military reservation was held by the United States at the time and long prior to the admission of Kansas as a state, such holding would not constitute a purchase with consent of the state, and was not within this provision of the constitution; but that, being used for military purposes, it was competent for the state to cede exclusive jurisdiction to the general government while so employed, and, such cession having been granted, its acceptance by the United States was presumed. Therefore, in the Benson Case, jurisdiction was upheld in the federal court of an indictment for murder committed upon the reservation. There the cession was of exclusive jurisdiction (with exceptions not material here) for military purposes, being one of those specified in this article of the constitution, and for which exclusive jurisdiction was clearly needful. The Wisconsin act and circumstances are clearly distinguishable. That the purpose was one not specifically named in the constitution, and one neither requiring nor intended by congress to have exclusive jurisdiction, has been previously discussed. That it was not the legislative intent to abdicate all powers appears from the omission in the act of the word "exclusive." It simply grants "jurisdiction over the several tracts" purchased. In the general sense, jurisdiction is not in its nature exclusive, but is concurrent. Com. v. Hudson, 11 Gray, 64.

The sovereign power of making laws in the United States is divided and qualified. Congress and the state legislatures frequently legislate over the same subjects, each within its sphere; but the powers of the former, while supreme within their province, are limited in range of subjects, and can only be exercised over such as are enumerated in the constitution. The state legislature, within its territory, has the general and residuary powers of legislation, and is limited only by the constitutional inhibitions, national and state. Of the powers granted by the constitution to congress, those which are necessarily exclusive are enumerated, and their compass is narrow and restricted. Others are conferred which may be made exclusive at the option of congress, but until they are exercised and made clearly exclusive, they remain common to the states. U. S. v. Bevans, 3 Wheat. 336. It was declared by Chief Justice Spencer, in the great and leading case of People v. Godfrey, 17 Johns. 225, as a fundamental principle, "that the rights of sovereignty are never to be taken away by implication"; and the rule thus stated is an accepted canon in the construction of powers between the nation and the state. Reading the Wisconsin act in the light of this rule, and in the view that the purpose was not one for which exclusive legislation was prescribed, either by the constitution or by congressional enactments, the omission of the word "exclusive" or some equivalent term is material, and in my opinion the act must be interpreted as

ceding—that is, yielding or surrendering—to the United States such jurisdiction as congress may find necessary for the objects of the cession and for the exercise of which there must be clear enactments to that end within its powers. So construed, the chief objection against the act, as found by the Wisconsin supreme court, that it would work an abdication of all state powers, is removed. The site would then stand in the same relation in which those for post offices and like structures of the general government are placed by the usual state cessions, with the civil and criminal jurisdiction of the state unimpaired. Its interpretation as conferring exclusive jurisdiction would require terms of exclusion to be inferred, and would reverse the strict rule above indicated. It would further give an effect to the act against the apparent intention of congress, and opposed to the intention, and possibly beyond the powers, of the state legislature. The inmates and any inhabitants of the tract are otherwise placed without the protection of local laws, and without civil laws or privileges. I cannot believe that such construction is either just or permissible.

The lands and property employed for the home constitute "instrumentalities for the execution of the powers of the general government," and are therefore "exempt from such control of the state as would defeat or impair their use for those purposes." Ft. Leavenworth R. Co. v. Lowe, supra. The management and officers are agencies of the United States, and as such are exempt from any interference by the authorities or courts of the state, in their control, discipline, or government of the homes or property. The act provides that the board may "make by-laws, rules, and regulations, not inconsistent with law, for carrying on the business and government of the home" (Rev. St. § 4825); that all inmates "shall be subject to the rules and articles of war in the same manner as if they were in the army" (section 4825). These provisions are designed and can have force only for the management and preservation of discipline. Within legitimate exercise there can be no interference with that management by the civil authorities, and any inquiry would probably be exclusively of federal cognizance. The articles of war, so far as they may be applicable, do not take the place of and cannot serve to supersede the criminal or civil laws. This is recognized by the 59th article (found in section 1342, Rev. St. U. S.), which provides for surrender to the civil jurisdiction where crimes not military are committed. Any different application would be prohibited by articles 5 and 6 of amendments to the constitution, as presentment by indictment of a grand jury and trial by jury are unknown to the articles of war or to any proceedings thereunder. Hearings of offenses under those articles are before a court-martial, a tribunal which forms "no part of the judicial system of the United States." Kurtz v. Moffitt, 115 U. S. 487, 500, 6 Sup. Ct. 148. Congress may undoubtedly enact such further laws as it may find necessary for the better protection and preservation of this instrumentality of its creation, and, in so far as it legislates within its powers, may exclude the operation of incompatible state laws. Having abstained from such legislation, the laws of the state remain in force.

, The crime with which the petitioner is charged is not, in my opinion, punishable under any statute of the United States applicable to the place in question, and jurisdiction cannot be entertained in this court. The petitioner must, therefore, be discharged, and it is so ordered.