LUPERCIO LÓPEZ, Petitioner, v. DISTRICT COURT OF SAN JUAN, ROBERTO H. TODD, JR., JUDGE, and HERNÁN R. FRANCO, DISTRICT ATTORNEY OF SAN JUAN, Respondents.

No. 77. Argued February 6, 1941.—Decided February 25, 1941.

118

R. *Rivera Zayas,* for petitioner. *A. Cecil Snyder, United States Attorney,* and *Adolfo Valdés Cobián, Assistant United States Attorney,* for the United States of America, as *amicus curiae.*

MR. JUSTICE TRAVIESO delivered the opinion of the court.

Two distinct informations, Nos. 4336 and 4337, were filed in the District Court of San Juan against the petitioner herein, Lupercio López, charging him with the commission of two separate offenses of rape. In a bill of particulars submitted by the district attorney it is alleged that the events took place in the Eleanor Roosevelt Development, also known as Roosevelt Ward, within the Municipality of Río Piedras, which is part of the Judicial District of San Juan, P. R. The defendant in each case filed a demurrer to the information alleging that the District Court of San Juan lacks jurisdiction over offenses committed within the boundaries of said development.

Both parties admitted the following facts: That the Eleanor Roosevelt Development is an urban property of 227.193 cuerdas, acquired by the United States of America through its agency the Puerto Rico Reconstruction Administration, by purchase from private individuals; that the above mentioned agency of the federal government has built on

said property some 500 dwellings, in accordance with a low-cost housing project approved by the President of the United States; and that the funds for the purchase of this land and the construction of said dwellings were placed at the disposal of said federal agency (PRRA) by the President, to be charged to the appropriations made by Congress under the Emergency Relief Appropriations Act of 1935.

After the demurrers filed by the defendant had been overruled by the lower court, the accused invoked the original jurisdiction of this Court through a petition for a writ of prohibition addressed to the District Court of San Juan and to the District Attorney of the same, ordering them to desist and abstain from continuing the prosecution of the two cases filed against the petitioner; or in the alternative for a writ of certiorari to review and annul the proceedings had in said court.

The parties were heard on February 6, 1941, with respect to whether the proceedings lied. Petitioner's attorney appeared and the Assistant United States Attorney also appeared as *amicus curiae,* both later filing briefs.

The contentions of the petitioner are essentially as follows:

1. That by virtue of the provisions of Section 5 of "An Act authorizing the Governor of Puerto Rico to convey certain lands to the United States for naval, military, and other public purposes," approved by the Legislature of Puerto Rico on February 16, 1903 (Sections 1670 to 1677, Revised Statutes of Puerto Rico, 1911 ed.), The People of Puerto Rico waived or transferred the jurisdiction over the lands of the Eleanor Roosevelt Development in favor of the United States, and that said lands from the moment they were acquired and taken possession of by the Federal Government for the purposes of said housing project, passed over to the exclusive jurisdiction of the Federal Government and its courts. The above cited insular statute reads thus:

"Section 5.—That consent be and is hereby given to the United States to acquire for naval, military or other public purposes, by purchase or condemnation, any lands within the Island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by The People of Porto Rico shall cease and determine; *Provided, however,* That upon the subsequent alienation by the United States of any land so acquired The People of Porto Rico shall again have jurisdiction thereover."

2. That as the Eleanor Roosevelt Development is a work of public utility and for public purposes, when the United States acquired and took possession of the lands necessary for said development, it accepted the authorization and consent given by The People of Puerto Rico by virtue of said insular statute, acquiring at the same time exclusive jurisdiction over said lands; and that from that moment The People of Puerto Rico and its courts lacked jurisdiction over crimes committed within the boundaries of the development.

The two questions which must be decided may be set forth as follows:

1. Has the United States by virtue of the provisions of Section 5 *supra* and of its purchase and assumption of possession of said lands, and without necessity of any other act or formality, acquired exclusive jurisdiction over the lands of the Eleanor Roosevelt Development?

2. Is the waiver or cession of jurisdiction over lands which form a part of the insular territory and which are used for the purpose of the Low-Cost Housing Project, valid and effective without the acceptance or assumption by the Government of the United States of exclusive jurisdiction over the same at the same time as or after said waiver or cession?

Both questions require a negative answer.

■ The Constitution of the United States provides (Art. I, sec. 8, clause 17) that the Congress shall exercise legislative power and exclusive authority over all those places

bought with the consent of the legislature of the state in which they are situated, for the construction of forts, warehouses, arsenals, piers and other needful buildings.

The intention of the Insular Legislature when it approved Section 5 of the Act of 1903 *supra,* was to give once and for all its consent to all those cases in which the United States should acquire by purchase or expropriation "for military or naval purposes or other public purposes", any lands in the island of Puerto Rico. The language of the local statute did not follow strictly that of the constitutional clause, but it says substantially the same, as it is obvious that forts, warehouses, arsenals and piers are built "for military or naval purposes." The phrase used in the constitutional clause "and other needful buildings" is less broad than that of the insular statute "or other public purposes." For the purposes of determining when and how the exclusive jurisdiction over the lands which it buys with the consent of the state, is automatically transferred to the Federal Government, we have made a careful study of the decisions interpreting the constitutional provision upon the matter.

When the Federal Government buys lands to devote them to one of the purposes specifically mentioned in the Constitution, and the state legislature has given its consent to such a purchase, the lands thus bought are *ipso facto* subjected to the exclusive legislative power of Congress; and from that moment and as an inevitable consequence the state jurisdiction ceases completely since exclusive jurisdiction always goes together with exclusive legislative power. *U. S. v. Cornell* (C. C. R. I. 1819) 2 Mason 60, 25 Fed. Cases No. 14,867; *Fort Leavenworth R. R. v. Lowe,* 114 U. S. 525, 29 L. Ed. 264. In the last cited case, when it held that the state of Kansas had not lost its jurisdiction over the Military Reservation of Fort Leavenworth, the Federal Supreme Court established the rule that should be applied when lands have been bought by the Federal Government "for the construc-

tion of forts, warehouses, arsenals, piers, and other needful buildings,'' without the consent of the state, expressing itself as follows:

''...The consent of the States to the purchase of lands within them for the special purposes named is, however, essential, under the Constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the States equally with the property of private individuals.

''Where, therefore, lands are acquired in any other way by the United States within the limits of a State than by purchase with her consent, they will hold the lands subject to this qualification: that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the State as would destroy or impair their effective use for the purposes designed. Such is the law with reference to all instrumentalities created by the general government. Their exemption from State control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers. But, when not used as such instrumentalities, the legislative power of the State over the places acquired will be as full and complete as over any other places within her limits.''

 Are the dwellings built by the PRRA in the Eleanor Roosevelt Development included in the class of buildings to which the phrase ''and other needful buildings'' of Article 1, sec. 8, clause 17 of the Federal Constitution refers? We do not think so. In accordance with the paragraphs which we have copied from the *Fort Leavenworth* case, *supra,* the ''other needful buildings'' to which the Constitution refers are those which are used to carry out the purposes of the Government and which the latter needs to utilize as instruments in the exercise of its governmental powers. See: *U. S.* v. *Tucker,*

122 Fed. 518; *Pundt* v. *Pendelton*, 167 Fed. 997; *U. S.* v. *Wurtzbarger*, 272 Fed. 752; *People* v. *Mouse*, 203 Cal. 782; *State* v. *Mack*, 47 Pac. 763. When the buildings are of that nature, the state jurisdiction can not intervene in such a way as "to destroy or diminish its effective use" for the purposes of the government, even though the land on which they were built have been bought without the consent of the state. It was held in *Battle* v. *United States*, 209 U. S. 36, 52 L. Ed. 670, that Congress has the power to buy lands for the construction of post-offices or courthouses and that when such a purchase is made with the consent of the state, Congress acquires the exclusive power to legislate over said lands, as post-office buildings are included among the "other needful buildings" to which the above cited constitutional provision refers. See: *Chicago, R. I. & P. Ry.* v. *McGlinn*, 114 U. S. 542, 29 L. Ed. 270; *Benson* v. *U. S.*, 146 U. S. 325, 36 L. Ed. 991.

Petitioner alleges that the housing project of the Eleanor Roosevelt Development is a work of public utility and for public purposes; that it tends to promote the health, comfort and welfare of its residents, providing them with sanitary and economic dwellings; and that when the Federal Government acquired these lands, took possession of them and began the construction of the development, it accepted the authorization and consent given by The People of Puerto Rico in the Act of 1903.

The case of *Re O'Connor*, 37 Wis. 386, had to do with the purchase of lands by a corporation organized under a law of Congress to establish "The National Home for Disabled Volunteer Soldiers". It was held that the cession which had been attempted had not conferred exclusive jurisdiction on the National Government "because the legislature does not have the faculty of giving up its jurisdiction over its own land, except when the lands have been bought by the United States for the purposes to which the Constitution re-

fers." And in answer to the argument that the services which the corporation was giving were of a public character, the Court expressed itself as follows:

" ...The corporation is in its nature and object a public charitable institution, worthy, doubtless, of public favor and of private munificence. It is not, however, to be confounded with the general government; nor are its rights and property in any just, legal sense, the rights and property of the United States."

*In re Kelly,* 71 Fed. 545, 552, the Circuit Court of Wisconsin decided:

"A state statute which provides 'that jurisdiction over the several tracts hereinafter mentioned be and hereby is ceded to the United States of America' did not grant exclusive jurisdiction when the purpose of the act was one not specifically mentioned in the Constitution, and one which did not require and over which Congress did not have the intention of enforcing exclusive jurisdiction. Such statute must be interpreted as ceding—that is, yielding or surrendering—to the United States such jurisdiction as Congress may find necessary for the objects of the cession and for the exercise of which there must be clear enactments to that end within its powers."

During the argument before this court and in their briefs, the parties have admitted—and we can take judicial knowledge of the fact—that the Insular Government as well as the municipality of Río Piedras exercise governmental powers and functions within the boundaries of the Eleanor Roosevelt Development, for the service, benefit and protection of the citizens who reside there. The children of the development attend public schools supported by the Insular Government; the Insular Government has also established there at its expense, medical and dental dispensaries and clinics to look after the health of those residents who are impoverished. Public order is there maintained by officers of the Insular Police. The services of aqueduct, garbage disposal and fire department are furnished by the Municipal Governments of San Juan and Río Piedras. The ward is physically incorporated to the Municipality of Río Piedras and there are no

fences or monuments of any class which serve as boundaries, and the streets are open to public use. All these facts constitute in our opinion clear proof that the project, by its very nature, cannot be considered as one of those specifically mentioned in the Constitution; that said project does not require the exercise of exclusive jurisdiction by Congress for its proper growth and operation; and lastly that Congress has not revealed in any way its intention of accepting and assuming exclusive jurisdiction in said development. In the case of *Rainier National Park Co.* v. *Martin,* 23 Fed. Supp. 60 (see 18 Fed. Supp. 481), decided in 1938, in which the Supreme Court refused to issue a writ of certiorari (302 U. S. 661), it was held that when the United States buys lands with the consent of a state legislature for a purpose which is not one of those enumerated in the Constitution, ''said lands of the Federal Government shall be free of any interference and the buildings which may be built upon them for the use by the state which may hinder their effective use for the purposes for which the property was acquired.'' And in *Williams* v. *Arlington Hotel Co.,* 22 Fed. (2d) 669, it was held that the jurisdiction of the United States is exclusive when the state cedes the land for governmental purposes; but if the land is acquired for any other purpose, the possession of the United States is merely that of a proprietor.

The Federal Supreme Court in one of its recent decisions, *Ryan* v. *State of Washington* (1938), 302 U. S. 186, 82 L. Ed. 187, established the rule that we consider applicable to the facts of the case before us. The question decided by the Supreme Court was whether or not the lands bought by the Federal Government for the construction project of ''Grand Coulee Dam'', with the consent of the State of Washington, given by virtue of a statute substantially the same as that of Puerto Rico, were under the exclusive jurisdiction of the United States. The conditions and circumstances under which the life of the community of workmen

employed in the construction of said dam was organized, were identical to those which prevail in the Eleanor Roosevelt Development. The state cooperated with the Federal Government so that the workmen and their relatives should have all the facilities and services required for communal life. The Supreme Court, taking these facts into consideration, said:

"No question is presented as to the constitutional authority of Congress to provide for this enterprise or to acquire the lands necessary or appropriate for that purpose. There is no contention that the State may interfere with the conduct of the enterprise. The question of exclusive territorial jurisdiction is distinct. That question assumes the absence of any interference with the exercise of the functions of the Federal Government and is whether the United States has acquired exclusive legislative authority so as to debar the State from exercising any legislative authority, including its taxing and police power, in relation to the property and activities of individuals and corporations within the territory. The acquisition of title by the United States is not sufficient to effect that exclusion. It must appear that the State, by consent or cession, has transferred to the United States that residuum of jurisdiction which otherwise it would be free to exercise.
(Citations.)

. . . . . . . .

"Not only do we find no violence done to federal right or frustration of federal intent by the State's construction of its statute, but the evidence is clear that the Federal Government contemplated the continued existence of state jurisdiction consistent with federal functions and invited the cooperation of the State in providing an appropriate exercise of local authority over the territory.

"Even if it were assumed that the state statute should be construed to apply to the federal acquisitions here involved, we should still be met by the contention of the Government that it was not compelled to accept, and has not accepted, a transfer of exclusive jurisdiction. As such a transfer rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive juris-

diction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State (citation), does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction. We have frequently said that our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency. In acquiring property, the federal function in view may be performed without disturbing the local administration in matters which may still appropriately pertain to state authority. In our opinion in *James* v. *Dravo Contracting Co.*, 302 U. S. 134, we observed that the possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired. And we added that there appeared to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases."

From 1841 to 1930 a federal statute was in effect which in its relevant part provided:

"No public money shall be expended upon any site or land purchased by the United States for the purposes of erecting thereon any customhouse, or other public building, of any kind whatever, until the written opinion of the Attorney General shall be had in favor of the validity of the title, nor until the consent of the legislature of the State in which the land or site may be, to such purchase, has been given...." (40 U.S.C.A. sec. 255, p. 71.)

The above cited statute says nothing concerning jurisdiction. The consent of the state was all that was required to carry out the purchase on the part of the Federal Government and the fact that the building was one of those included within the constitutional provision was enough to give the United States exclusive jurisdiction.

In 1930, when the Federal Government began to put into effect its policy of helping the states and territories in the clearance of slums, the construction of low-cost housing projects, and other emergency projects, and later, on February

1, 1940, Congress, wishing to avoid the imposition upon the Federal Government of exclusive jurisdiction over said projects, due to the consent which the states gave to the acquisition of lands by the said Federal Government, amended Section 255 *supra*, so as to read in part as follows:

" ...Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not therefore obtained, over any such lands or interests as he may deem desirable *and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated.* Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted." (Italics ours.) 40 U.S.C.A. sec. 255, 1940–41 Supp.

Therefore, as long as no evidence is presented that the United States has accepted and assumed jurisdiction over this development, we must presume conclusively that such jurisdiction has not been accepted.

On June 29, 1936, Congress, with the evident intention of avoiding the need of assuming and exercising exclusive jurisdiction over slum-clearance and low cost housing projects, enacted the following law:

"Sec. 421.—*Jurisdiction of state or political subdivision; civil rights under local law preserved.*

"The acquisition by the United States of any real property acquired before or after June 29, 1936 in connection with any low-cost housing, or slum-clearance project constructed before or after June 29, 1936, with funds allotted to the Federal Emergency Administration of Public Works pursuant to sections 401 to 411 of this

title, the Emergency Relief Appropriation Act of 1935, or any other law, shall not be held to deprive any State or political subdivision thereof of its civil and criminal jurisdiction in and over such property, or to impair the civil rights under the local law of the tenants or inhabitants on such property; and insofar as any such jurisdiction has been taken away from any such State or subdivision, or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such State or subdivision. (June 29, 1936, c. 860, sec. 1, 49 Stat. 2026.)'' 40 U.S.C.A. sec. 421, 1938 Supp.

In accordance with the facts admitted by the parties and the decisions and statutes to which we have referred, we are of the opinion and hereby hold that the United States, when they bought and took possession of the lands of the Eleanor Roosevelt Development did not *ipso facto* assume exclusive jurisdiction over said development, because the buildings built upon them are not included in the classification of ''other needful buildings'' to which the Constitution refers; that no averment having been made or evidence presented concerning the acceptance of exclusive jurisdiction by the Federal Government, we are compelled to presume conclusively that there has not been such an acceptance; and lastly that if The People of Puerto Rico at any moment or for any reason lost civil and criminal jurisdiction over the lands and the inhabitants of said housing development, that jurisdiction was reacquired by virtue of the provisions of section 421 *supra*, with the sole limitation that The People of Puerto Rico cannot intervene in any form in the administration of said ward, nor execute any act which may destroy or diminish the effective use of the properties with respect to the purposes for which they were built.

The cession or waiver of jurisdiction made by the Island of Puerto Rico by virtue of the Act of 1903 is not and cannot be effective until the Federal Government shall have accepted it. As long as such an acceptance does not exist, the Insular Government can and must continue to exercise civil and criminal jurisdiction in and over the Eleanor Roosevelt De-

velopment, and its inhabitants, since we can not conceive that Congress and the Insular Legislature intended to create a zone of anarchy under our national flag, wherein the most serious crime could be committed with absolute impunity, because there was no federal or insular court with jurisdiction to punish it.

For the foregoing reasons we are of the opinion that the District Court of San Juan has ample jurisdiction to try and punish offenses which may be committed within the boundaries of the Eleanor Roosevelt Housing Development, and therefore neither of the writs requested lies.

The petition must be denied.

Mr. Justice Todd, Jr., took no part in the decision of this case.