---

## In re LADD.

(Circuit Court, D. Nebraska. May 7, 1896.)

1. JURISDICTION—EFFECT OF CESSION BY STATE—NEW RESTRICTIONS.

An act of the legislature of a state ceding to the United States the jurisdiction of the state over a tract of land used as a military reservation, upon condition that such jurisdiction shall continue only so long as the United States shall own and occupy such reservation; that the state shall have the right, within the reservation, to serve civil process, and to execute criminal process against persons charged with crime committed within the state; and that roads may be opened and kept in repair within such reservation,—cedes to the United States the entire political jurisdiction of the state over the place in question, including judicial and legislative jurisdiction, except as to service of process and opening roads, and the same cannot be affected or further limited, without the consent of the United States, by a subsequent act of the state legislature attempting to impose additional restrictions on the jurisdiction ceded.

2. SAME—JUDICIAL OFFICERS.

After such cession a justice of the peace, acting under authority of the state, has no jurisdiction over the ceded territory in matters of alleged criminal violation of the laws of the state committed on such territory.

3. SAME—CIVIL AND CRIMINAL LAWS.

While after such cession the municipal laws of the state governing property and property rights continue in force in the ceded territory, except so far as in conflict with the laws and regulations of the United States applying thereto, the criminal laws of the state cease to be of force within the ceded territory, and laws regulating the sale of intoxicating liquors, requiring a license therefor, and punishing unlicensed sales, cease to be operative, both as in conflict with the regulations of the United States governing military reservations, and as penal in character.

Submitted on petition for writ of habeas corpus, and the return of Arthur M. Bartlett, sheriff of Dawes county, Neb., to the writ, showing the process under which the applicant was arrested, and the grounds for the issuance thereof.

A. J. Sawyer, U. S. Dist. Atty., and E. H. Crowder, Major and Judge Advocate U. S. Army, for petitioner.

Arthur M. Bartlett, pro se.

SHIRAS, District Judge. The facts of this case, as gathered from the record submitted to the court, appear to be as follows:

The petitioner, Eugene F. Ladd, is an officer of the United States army, holding the position of first lieutenant in the ninth cavalry,

now stationed at Ft. Robinson, which is situated in Dawes county, state of Nebraska. By a special order issued under date of January 4, 1896, by Col. Biddle, then in command at said fort, Lieut. Ladd was detailed on special duty as officer in charge of the post exchange established at the named fort, which since November 14, 1876, has been a military post of the United States. That post exchanges are established and maintained in pursuance of special regulations issued by the war department. That since the 25th of July, 1895, the following, among other, regulations have been, and continue to be, in force, and to be applicable to the post exchange at Ft. Robinson as well as to other posts throughout the country:

"(1) Purpose. The post exchange will combine the features of reading and recreation rooms, a co-operative store, and a restaurant. Its primary purpose is to supply the troops, at reasonable price, with the articles of ordinary use, wear, and consumption not supplied by the government, and to afford them means of rational recreation and amusement. Its secondary purpose is, through exchange profits, to provide, the means for improving the messes.

"(2) Building. At every post, where practicable, the post commander will institute a post exchange. For this purpose he will set apart any suitable public building or rooms that are available, or will authorize the renting of any private building, or part thereof, on the reservation (the rental to be paid from the funds of the exchange), or, when sufficient exchange funds are available, may cause a suitable building to be erected for the purpose; and if a temporary building, or if constructed wholly or in part by the labor of troops, use of the necessary teams, and such tools, window sash, doors, and other material as can be spared by the quartermaster's department, is authorized. But no permanent structure will be erected on a reservation without first obtaining the authority of the secretary of war. Expenses of repairs or alterations of public buildings for the use of the exchange will be borne by the exchange, when they cannot be provided for by the quartermaster's department.

"(3) Management of Business. The management of the affairs of the exchange will be conducted by an officer designated 'Officer in Charge,' selected and detailed by the commanding officer. This officer should be fully in sympathy with the purposes of the exchange, and possess the business qualifications necessary to its success. He will be assisted by a steward, and such other attendants as the business may warrant. In establishing a new exchange, and at posts where the business is small, the steward and attendants may be enlisted men; but, when practicable, civilians will be employed, instead, in all exchanges whose financial condition will justify the expense, and, in selecting them, preference will be given to retired enlisted men and honorably discharged soldiers.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"(5) The Exchange Council. The superintendence of the affairs of the exchange will be vested in a council, to consist of three officers, one of whom shall be the officer in charge; the others, the two company commanders longest off this duty at the post.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"(9) Exchange Features. An exchange doing its full work should embrace the following sections: (a) A well-stocked general store, in which such goods are kept as are usually required at military posts, and as extensive in number and variety as conditions will justify. (b) A well-kept lunch counter, supplied with as great a variety of viands as circumstances permit, such as tea, coffee, cocoa, nonalcoholic drinks, soups, fish, cooked and canned meats, sandwiches, pasties, etc. (c) A canteen, at which, under the conditions hereinafter set forth, beer and light wines, by the drink, and tobaccos, may be sold. (d) Reading and recreation rooms, supplied with books, periodicals, and other reading matter; billiard and pool tables, bowling alleys, and facilities for other proper indoor games, as well as apparatus for outdoor sports and exercises, such as cricket, football, baseball, tennis, etc.; a well-equipped gymnasium, possessing also the

requisite paraphernalia for outdoor athletics. At small posts it may be impracticable to maintain all of these sections, but at every exchange there should be no less than two departments,—the refreshment, embracing store, lunch counter, and canteen; and the recreation, which includes all the other branches.

"(10) Sale of Liquor Prohibited. The sale or use of ardent spirits in any branch of the exchange is strictly prohibited, but on the recommendation of the exchange council the commanding officer may permit beer and light wines to be sold at the canteen, by the drink, whenever he is satisfied that giving to the troops the opportunity of obtaining such beverages within the post limits will prevent them from resorting for strong intoxicants to places without such limits, and tend to promote temperance and discipline among them. Should the commanding officer not approve the recommendation of the exchange council, it will be submitted for formal decision to the department commander. The canteen must be in a room used for no other purpose, and, when practicable, in a building apart from that in which the recreation and reading rooms are located. The sale of beer must be limited to week days, and the beer be consumed upon the premises."

It further appears that for some years past there has been maintained at Ft. Robinson, in one of the buildings on the military reservation, a post exchange, conducted under the regulations issued by direction of the war department; that, under the recommendation of the exchange council, the commanding officer at Ft. Robinson has authorized the keeping and sale of beer and light wines at the post exchange, and the same have been so kept and sold under the supervision of the several officers in charge of said post exchange, including the petitioner in this case. It further appears that, under the provisions of the statutes of Nebraska, no person within the jurisdiction of the state is permitted to sell or give away any intoxicating liquors, including wine or beer, unless duly licensed so to do by the county commissioners, or by the proper city or town authorities; and parties so selling without a proper license are liable to punishment, and may be brought before a justice of the peace for the purpose of a preliminary examination, and, if cause exists, may be held to answer at the next term of the district court. It further appears that on the 31st of March, 1896, an information was filed before Henry Tisch, a justice of the peace residing in Dawes county, Neb., charging that the petitioner, with one Alfred Bratton, "did on or about the 22d day of March, 1896, on the Ft. Robinson military reservation, in said Dawes county, unlawfully sell and deliver to Lemiel Cogvill one glass of malt liquor, to wit, beer, and did on or about the 22d of March, 1896, on the Ft. Robinson military reservation, in said Dawes county, unlawfully sell and deliver to Albert Bettis one glass of malt liquor, to wit, beer, and did on or about the 23d day of March, 1896, on the Ft. Robinson military reservation, in said Dawes county, unlawfully sell and deliver to William Washington one glass of malt liquor, to wit, beer." And thereupon the said justice issued a warrant of arrest, under which the sheriff of Dawes county, Arthur M. Bartlett, arrested Lieut. Ladd, and took him before the justice, by whom the hearing was fixed for the 9th day of May. On the same day, to wit, March 31, 1896, an information was laid before the same justice of the peace, charging that there was kept on the Ft. Robinson military reservation, for purposes of sale, certain beer, wine, and whisky; that the same were in and about

the building known as the "Post Exchange," and were in the possession of Eugene F. Ladd and Alfred Bratton, who were selling the same without having paid for and obtained the license required by the statutes of Nebraska. Upon this information a warrant was issued to the sheriff of Dawes county, upon which Lieut. Ladd was arrested, taken before the justice, and the hearing fixed for the 9th day of May. The return of the sheriff shows that under this warrant he seized certain beer and wine, but nothing else. For the purpose of freeing himself from the arrests made on the warrants above described, Lieut. Ladd made application to this court for the issuance of a writ of habeas corpus, claiming that the laws of the state of Nebraska regulating the sale of liquors, spirituous and malt, have no application to the military reservation known as "Ft. Robinson"; that the justice of the peace who issued the warrants of arrest for acts done on the reservation was wholly without jurisdiction; and that the arrest and consequent detention of petitioner by the sheriff of Dawes county were without authority of law. The application having been granted, the writ issued to Arthur M. Bartlett, who has made due return thereto, setting forth the warrants issued to him by the justice of the peace, the informations upon which they were issued, and copies of his returns, showing the arrest of petitioner thereon.

From this statement of the facts, it appears that the right of the sheriff of Dawes county to hold the petitioner in custody depends upon the question whether the laws of the state of Nebraska regulating the sale of liquors are in force upon the military reservation known as "Ft. Robinson," belonging to the United States, and used for military purposes; for, if such laws are not operative within the limits of the reservation, then the sales of beer charged to have been made by the petitioner within the limits of the reservation could not be held to be violations of the statutes of the state, and the state authorities would be without jurisdiction in the premises. The ultimate question for decision is one of jurisdiction, and the case falls within the class wherein the circuit court of the United States is justified in granting the writ of habeas corpus for the purpose of determining whether the court upon whose writ the person is deprived of his liberty has, in any view of the facts, jurisdiction in the premises. Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734; In re Frederich, 149 U. S. 70, 13 Sup. Ct. 793; Nielsen, Petitioner, 131 U. S. 176, 9 Sup. Ct. 672. The facts necessary to the consideration and determination of the question of the jurisdiction of the state of Nebraska over the Ft. Robinson military reservation are as follows:

The title to the land within the limits of the reservation is now in the United States, and has been ever since the acquisition of the territory by the United States under the cession made by France in 1803. When Nebraska was admitted into the Union as a state, in 1867, the land not being then used for military purposes, it passed under the jurisdiction of the newly-created state. In November, 1876, in pursuance of an order of the executive of the United States, a military post or reservation was established on

the land, troops were stationed thereon, and from that time the premises have been continuously in use for military purposes. The legislature of the state of Nebraska in March, 1887, passed an act reading as follows:

"Be it enacted by the legislature of the state of Nebraska.

"Section 1. That the jurisdiction of the state of Nebraska in and over the military reservations, known as Fort Robinson and Fort Niobrara, be and the same are hereby ceded to the United States: provided, that the jurisdiction hereby ceded shall continue no longer than the United States shall own and occupy said military reservations.

"Sec. 2. The said jurisdiction is ceded upon the express condition that the state of Nebraska shall retain concurrent jurisdiction with the United States in and over said military reservations so far as that all process in all civil cases, and such criminal or other process may issue under the laws or authority of the state of Nebraska against any person or persons charged with crime or misdemeanor committed within said state, may be executed therein in the same way and manner as if such jurisdiction had not been ceded, except so far as such process may affect the real and personal property of the United States: provided, that nothing in the foregoing act shall be so construed as to prevent the opening and keeping in repair public roads and highways across and over said reservations." Laws 1887, p. 628.

Since the adoption of this act by the state legislature the United States has expended large sums of money in the erection of new buildings, and in the completion of other improvements in connection with the fort in question. In March, 1889, the legislature of Nebraska adopted an act in the following terms:

"Be it enacted by the legislature of the state of Nebraska:

"Section 1. That section ten (10), article thirteen (13), of chapter eighty-three (83), of an act ceding the jurisdiction over the military reservations of Fort Niobrara and Fort Robinson, Nebraska, be amended to read as follows: 'That the jurisdiction of the state of Nebraska, in and over the reservations known as Fort Niobrara and Fort Robinson, be and the same are hereby ceded to the United States': provided, that the jurisdiction hereby ceded to the United States shall continue no longer than the United States shall own or occupy said military reservations: provided, further, that nothing in this act shall exempt any property within the limits of said military reservations belonging to any civilian therein from assessment, levy and collection of tax which would otherwise be subject to taxation within Nebraska, except the personal property of the officers and enlisted men in the service of the United States who may be stationed on said military reservations, the said personal property being owned by said officers and enlisted men for their comfort and convenience. Nor shall any of the provisions of this act in any way interfere with any proper officer of the state of Nebraska in entering upon said reservations for the purpose of assessment or collecting any taxes due said state. Nor shall any of the provisions of this act prevent the enforcement on said military reservations of chapter fifty (50) of the Compiled Statutes relating to the license and sale of intoxicating liquors.

"Sec. 2. That section ten (10), article thirteen (13), chapter eighty-three (83), as now existing is hereby repealed and this, the section substituted in its stead: provided, that all suits pending and all rights acquired under section hereby repealed shall be saved the same as though said section had continued in force.

"Sec. 3. Whereas, an emergency exists, this act shall take effect and be in force from and after its passage.

"Approved March 29th, 1889." Laws 1889, p. 499.

The general rules of law applicable to and decisive of this case are to be found in the opinion of the supreme court in the case of Railroad Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995; Railway Co.

v. McGlinn, 114 U. S. 542, 5 Sup. Ct. 1005; and Benson v. U. S., 146 U. S. 325, 13 Sup. Ct. 60. In these cases, all of which arose in Kansas, the facts were that the Ft. Leavenworth military reservation was established on lands owned by the United States, but when Kansas became a state no reservation of jurisdiction over the same was made in favor of the United States, but in 1875 the legislature of the state passed an act declaring—

"That exclusive jurisdiction be and the same is hereby ceded to the United States over and within all the territory owned by the United States and included within the limits of the United States military reservation in said state, as declared from time to time by the president of the United States, saving, however, to the said state the right to serve civil or criminal process within said reservation, in suits or prosecution for or on account of rights acquired, obligations incurred or crimes committed in said state, but outside of said cession and reservation; and saving further to said state the right to tax railroads, bridges or other corporations, their franchises and property on said reservation."

In the case of Railroad Co. v. Lowe, supra, the question involved was whether, under this act, the state of Kansas could impose a tax upon the property of the railroad company which was wholly within the boundaries of the reservation. In the opinion given in that case it is held, after a full discussion of the authorities, that if property is purchased by the United States, with the consent of the state wherein the same is situated, for the erection of forts, magazines, arsenals, dock yards, or other needful buildings, thereon, then, under the provisions of clause 17, § 8, art. 1, of the constitution of the United States, the jurisdiction over the same would be exclusive in the United States, but that if the property so used was not purchased by the United States with the consent of the state, but it was in fact used for any of the named purposes without any special cession or grant from the state, the buildings and their appurtenances, as instrumentalities necessary to the execution of the powers of the national government, would be free from such interference and jurisdiction of the state as would impair or destroy their effective use for the purposes designed; and, further, that it was within the power of the state to make cession of its legislative and political jurisdiction to the United States, over such portions of the territory of the state as were needful for the purposes of the general government, but that in making such cession the state might make such reservations as would not interfere with the use to which the property was to be put by the United States. It was held in that case that the reservation in the act of cession, preserving to the state of Kansas the right to tax railroad property on the reservation, did not in any way conflict with the purposes of the cession, and it was therefore valid. The same principles were restated in the case of Railway Co. v. McGlinn, supra. In Benson v. U. S., supra, the question was whether the Ft. Leavenworth military reservation was within the exclusive jurisdiction of the federal government, in such sense that the United States circuit court in Kansas had jurisdiction in case of homicide committed within the limits of the reservation, but not within any of the buildings situated thereon.

The indictment was based upon section 5339 of the Revised Statutes, which enacts that:

"Every person who commits murder, first, within any fort, arsenal, dock yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States, * * * shall suffer death."

The supreme court held that, within the meaning of this section, the United States had exclusive jurisdiction over the entire military reservation of Ft. Leavenworth, and, so holding, affirmed the sentence of death rendered by the circuit court. It being the fact, as already stated, that when Nebraska became a state no reservation of exclusive jurisdiction in the United States over the land forming the Ft. Robinson military reservation was made, it follows, from the principles announced by the supreme court in the cases just cited, that the reservation passed under the general legislative control of the state, subject, however, to the restriction that the state could not interfere with the proper use of the reservation by the United States for military purposes. This continued to be the situation until the passage of the act of the state legislature approved March 29, 1887, and already quoted at length. The first section of this act expressly enacts "that the jurisdiction of the state of Nebraska in and over the military reservations, known as Fort Robinson and Fort Niobrara, be and the same are hereby ceded to the United States." In other words, all the jurisdiction with which the state was clothed, at the time of its creation and admission into the Union, over the reservations named, was in turn ceded to the United States, subject, however, to three conditions: First, that the cession of jurisdiction should continue only so long as the United States shall own and occupy the military reservations named; second, that during the time the cession of jurisdiction should continue in force the state should have the right, within the boundaries of the reservation, to serve all civil process, and to execute all criminal or other process issued under the laws of the state against persons charged with crime or misdemeanor committed within the state; and, third, that public roads and highways might be opened and kept in repair within such reservations. In the act of the legislature of the state of Kansas ceding jurisdiction over the Ft. Leavenworth reservation, the proviso in regard to the service of criminal process, in terms, applied only to crimes committed outside the reservation; but the reasoning employed by the supreme court in passing upon the general questions in Railroad Co. v. Lowe, supra, tends strongly to support the view that this restriction in the Nebraska act is merely a saving of the right to serve or execute process within the reservation for crimes committed outside the reservation, or, in other words, it was thereby intended to prevent the reservation from becoming a place of refuge for persons charged with violation of the laws of the state. The reservation of concurrent jurisdiction found in the second section of the act of March 29, 1887, in terms applied only to the matter of service or execution of process, and there is no ground for extending its meaning beyond the fair import of the language found therein. The section

does not provide that the state of Nebraska retains jurisdiction over acts done upon the reservation; nor does it provide that the laws of the state shall continue in force upon the reservation; nor does it provide that the courts of the state shall continue to have jurisdiction over the reservation, or over crimes committed thereon. The section deals only with the matter of the execution of process, and does not attempt, in any other matter, to save the jurisdiction of the state, either legislative or judicial, over the reservation. The general effect of a reservation of the nature of that contained in section 2 of the act under consideration has been frequently a subject of judicial interpretation, and notably in the cases of Com. v. Clary, 8 Mass. 72; Mitchell v. Tibbets, 17 Pick. 298; Lasher v. State (Tex. App.) 17 S. W. 1064; Sinks v. Reese, 19 Ohio St. 306; U. S. v. Cornell, 2 Mason, 60, Fed. Cas. No. 14,867; U. S. v. Meagher, 37 Fed. 875; Railroad Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995,—and the conclusions therein announced fully support the contention that a reservation expressed in the terms employed in the second section of the Nebraska act of March 29, 1887, can be applied only to the matter of the service or execution of process within the reservation, and therefore it must be held that the cession of jurisdiction contained in the first section of the act clothed the United States with the exclusive jurisdiction over the reservation; such exclusive jurisdiction to continue so long as the United States shall own and occupy the reservation, and subject only to the right of the state to open and keep in repair public roads and highways, and to serve and execute process within the limits of the reservation. When this grant of exclusive jurisdiction to the United States took effect, the laws of the state ceased to be operative within the reservation, except so far as the United States should choose to enforce them, and the courts of the state ceased to have jurisdiction over crimes committed within the reservation.

But it is said that, admitting this to be the true construction of the cession of jurisdiction found in the act of March 29, 1887, nevertheless the act of the legislature of the state of Nebraska approved March 29, 1889, created other restrictions upon the jurisdiction ceded to the United States, and particularly with regard to the right to enforce within the reservation the provisions of the state statute relating to the license and sale of intoxicating liquors. No extended argument is needed to show that it was wholly without the power of the state of Nebraska to thus limit the completed cession of jurisdiction created by the act of March, 1887. When the latter act took effect the legislative jurisdiction of the state over the reservation was wholly ceded to the United States, and until the exclusive jurisdiction thus acquired by the United States is terminated, either by the United States ceasing to own and occupy the reservation, or by the United States retroceding its exclusive jurisdiction to the state, the latter is without legislative power over the reservation. The same conclusion follows if the act of March, 1887, is viewed, not simply as a cession of jurisdiction on the part of the state, but as a contract

between the state and the United States whereby the latter procured from the former a grant of entire jurisdiction of the state over the reservation, to the end that the reservation might be wholly devoted to the military purposes of the United States, subject only to the right of the state to serve and execute process within the reservation, and to open and keep in repair public roads and highways therein. In Railroad Co. v. Lowe, supra, and Railway Co. v. McGlinn, supra, it is expressly held by the supreme court that the United States and a state have the power to contract for the cession of exclusive political and legislative jurisdiction over any portions of the territory of a state needed by the national government for military, naval, or other like purposes; and it was also therein held that, as the cession conferred a benefit upon the United States, its acceptance by the latter would be presumed,—and in Stanley v. Schwalby, 16 Sup. Ct. 754, it is held that:

"A valuable consideration may be other than the actual payment of money, and may consist of acts done after the conveyance. The advantage accruing to the city of San Antonio from the establishment of the military headquarters there was a valuable consideration for the deed of the city to the United States."

Here we find that there were parties competent to contract; a subject-matter to be contracted about; an agreement reached, as evidenced by the adoption of the act of March, 1887, by the legislature of the state, and its acceptance by the United States; and a sufficient consideration, in the large outlay of money made by the United States in the enlargement of the post, and other improvements made on the reservation. This completed and accepted contract could not be afterwards abrogated or modified by the legislature of the state, as was attempted to be done by the adoption of the so-called amendatory act of March, 1889. By the cession of jurisdiction contained in the act of March, 1887, the state had parted with the power of legislative control over the reservation, except in the matter of service of process, and in regard to roads and highways; and under the provisions of section 10, art. 1, of the constitution of the United States, the state could not abrogate the contract it had entered into with the United States, and therefore the provisions contained in the so-called amendatory act are wholly nugatory.

But it may be said that, when the state of Nebraska ceded its jurisdiction over the reservation to the United States, that fact did not necessarily terminate the obligatory force of the laws of the state then in existence, and which were applicable to the reservation previous to the adoption of the act of cession. It will be borne in mind that the petitioner in this case is deprived of his liberty by virtue of an arrest made by the sheriff of Dawes county upon warrants issued by a justice of the peace holding office under the laws of the state of Nebraska. Granting for the moment that the laws of the state might continue in force within the reservation after the taking effect of the act of March, 1887, would the jurisdiction of the justice of the peace also continue

over the reservation? If the jurisdiction of the United States is exclusive, then the state is without jurisdiction. Acts done on the reservation since March, 1887, cannot be said to be within the jurisdiction of the state, because by that act the state parted with its jurisdiction over the reservation, and therefore the justice was without jurisdiction in the premises, because the acts complained of, to wit, the selling beer, etc., were done at a place without the jurisdiction of the state. But are the provisions of the statutes of Nebraska providing for the punishment of parties who sell intoxicating liquors without a license in force within the reservation, upon the theory that the laws in force at the date of the act of cession continue in force in the ceded territory? In the case of Railway Co. v. McGlinn, supra, the supreme court, in dealing with the general question, held that:

"It is a general rule of public law, recognized and acted upon by the United States, that, whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country (that is, laws which are intended for the protection of private rights) continue in force until abrogated or changed by the new government or sovereign. By the cession, public property passes from one government to the other; but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment."

And it was further declared that this general rule held good in cases of cession from the states to the general government. This decision gives the rule to be applied in cases of property and property rights, but it is not applicable to criminal laws, in cases wherein the jurisdiction of a state is ceded to the United States. The cession of jurisdiction over a given territory takes the latter from within, and places it without, the jurisdiction of the ceding sovereignty. After a state has parted with its political jurisdiction over a given tract of land, it cannot be said that acts done thereon are against the peace and dignity of the state, or are violations of its laws; and the state certainly cannot claim jurisdiction criminally by reason of acts done at places beyond, or not within, its territorial jurisdiction, unless by treaty or statute it may have retained jurisdiction over its own citizens, and even then the jurisdiction is only over the person as a citizen. Thus, in Wisconsin v. Pelican Ins. Co., 127 U. S. 265–289, 8 Sup. Ct. 1370, it is said:

"By the law of England and of the United States, the penal laws of a country do not reach beyond its own territory, except when extended, by express treaty or statute, to offences committed abroad by its own citizens; and they must be administered in its own courts only, and cannot be enforced by the courts of another country."

Or as was tersely said by Mr. Chief Justice Marshall, speaking for the supreme court, in the case of The Antelope, 10 Wheat. 66–123:

"The courts of no country execute the penal laws of another."

It was further said in the course of the opinion given in the McGlinn Case that:

"As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions, and constitution of the new government are at once displaced."

When, therefore, the political jurisdiction over the reservation in question was ceded by the state to the United States, the reservation became subject to the laws and regulations of the United States then in force relative to military reservations, as well as to the laws and regulations since enacted or adopted for the government of the posts, forts, and military reservations belonging to the United States; and all laws of the state, civil in nature, must yield, if in conflict with the laws or regulations of the United States. Under the laws of the United States, provision is made for keeping and selling beer and wine, under certain restrictions, at the post exchange kept upon the military reservation at Ft. Robinson. The law of the state imposing a license fee upon persons engaged in the sale of liquors, and providing for the punishment of those who carry on the business without a permit, cannot be held to be in force within the reservation, because it is in conflict with the laws and regulations of the United States, and because it is penal in its nature, and is not, therefore, applicable to a place or territory without the jurisdiction of the state. Unless these conclusions are well founded, we would have presented in this case the curious anomaly of an officer of the United States army being held to account, and sentenced to punishment, for an alleged violation of a state law, when he was required to do the act complained of, by virtue of his assignment to duty as an officer of the post exchange, and in carrying out the regulations lawfully prescribed for the conduct of a post exchange; the exchange being located upon, and the act complained of being done within, the limits of a military reservation over which the exclusive political jurisdiction, save in the matter of executing process and opening and repairing public roads and highways, had been duly ceded by the state to the United States.

To briefly recapitulate the conclusions reached, I hold that by the act of the state legislature approved March 29, 1887, the state of Nebraska ceded to the United States its entire political jurisdiction, which includes judicial and legislative jurisdiction, save in the matter of executing process and opening and repairing roads and highways, over the Ft. Robinson military reservation; that this jurisdiction thus ceded to and accepted by the United States could not be recaptured by the action of the state alone, and therefore the jurisdiction ceded by the act of 1887 was not affected by the action of the state legislature in passing the so-called amendatory act of March 29, 1889; that after the cession of jurisdiction on part of the state, in 1887, justices of the peace acting under the authority of the state of Nebraska ceased to have jurisdiction over the ceded territory in matters of alleged criminal violation of the laws of the state committed on the reservation; that after the cession by the state, and acceptance by the United States, of jurisdiction over the reservation, the statutes of the state regulating the sale of liquors ceased to be in force within the territory

ceded to the United States. From these conclusions it, of necessity, follows that the warrants issued by the justice of the peace of Dawes county, upon which the petitioner was arrested by the sheriff, were so issued without due warrant of law; the informations filed with the justice showing upon their face that the acts complained of had not been done within the jurisdiction of the state, and that they could not be held to be in violation of the statutes of the state. This being so, the petitioner is clearly deprived of his liberty without due warrant of law, and is therefore entitled to be discharged from arrest.