## UNITED STATES v. TUCKER.

(District Court, W. D. Kentucky. May 5, 1903.)

1. UNITED STATES—CRIMINAL JURISDICTION—AUTHORITY OVER PLACE ACQUIRED FOR MAINTENANCE OF LOCKS AND DAMS.

Under Const. art. 1, § 8, cl. 17, giving the Congress power "to exercise exclusive legislation in all cases whatsoever over * * * all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings," such power extends to land purchased by the United States, by consent of the legislature of the state, and used for the public governmental purpose of maintaining thereon locks and dams for the improvement of the navigation of a river, and the United States has exclusive jurisdiction to prescribe and punish criminal offenses committed thereon; and the fact that the legislative consent was granted after the purchase is immaterial so far as relates to offenses committed thereafter.

2. SAME—SOURCES OF JURISDICTION.

The exclusive jurisdiction of the United States to prescribe and punish criminal offenses committed on land or in a "place" occupied for governmental purposes may be derived either from article 1, § 8, of the Constitution, where the place was purchased by consent of the state legislature, or from an express cession of such jurisdiction by the legislature.

8. SAME—STATUTE GOVERNING CRIMINAL OFFENSES.

Rev. St. § 5391 [U. S. Comp. St. 1901, p. 3651], making criminal offenses committed in any place under the jurisdiction of the United States, not prohibited or provided for by any law of the United States, subject to punishment in accordance with the laws of the state in which such place is situated, "now in force," is not referable, for the purpose of ascertaining the state laws applicable, to the date when it was first enacted, in 1825, but to the date of the adoption of the Revised Statutes, in 1878, by sections 5595 and 5596 [page 3751], of which the prior act was superseded and repealed. In no event could such section relate back to an earlier date than April 5, 1866, when the old act was substantially reenacted.

4. INDICTMENT—STABBING WITH INTENT TO KILL—SUFFICIENCY UNDER KENTUCKY STATUTE.

An indictment for the offense of cutting and stabbing with intent to kill, committed at a place within the exclusive jurisdiction of the United States, situated within the state of Kentucky, considered, and *held* sufficient under the laws of the state applicable thereto.

Criminal Prosecution. On demurrer to indictment.

R. D. Hill, U. S. Atty.

George W. Jolly, for defendant.

EVANS, District Judge. The indictment in this case contains two counts. In the first it is charged "that heretofore, to wit, on the thirteenth day of May, in the year of our Lord nineteen hundred, Ed. A. Tucker, in the then district of Kentucky, and in what is now the Western District of Kentucky, and in the county of Ohio within said district, and at what is known as Lock Number Three, on Green river, and upon a certain tract of land upon which said lock was then and there and now is located, which land and which lock were then and there and now are the property of and owned by the United States, and upon which land and in and at which place thereon the United States then conducted and carried on and now conducts and carries on a part of its public business, to wit, the providing of locks and

dams on said Green river for the safe and useful navigation thereof, and which land and lock had, before said 13th day of May, 1900, been duly purchased by and ceded to the United States with the consent of the Legislature of the state of Kentucky, and which were then and there and which are now under and within the exclusive jurisdiction of the United States, as well by the said purchase and the consent of the Legislature of the state of Kentucky which was given thereto as by an express act of said Legislature in that behalf and ceding said jurisdiction, to wit, an act entitled 'An act to grant the consent of the state of Kentucky to the acquisition by the United States of certain lands within the commonwealth bordering on Green and Barren rivers for certain purposes,' and which act was approved February 20th, 1886 [1 Sess. Acts 1885–86, p. 11, c. 69], by the Governor of the said state, did unlawfully, willfully and feloniously, and with malice aforethought, cut, strike and stab one John L. Ewing with a knife with intention to kill him, the said Ewing, but from the wound so inflicted the said Ewing did not die." The second count, in which the place of the occurrence is described in the same language as in the first count, charges that the accused "did willfully and unlawfully, in sudden heat and passion, and not in self-defense, cut, stab, and wound with a knife one John L. Ewing, without killing him."

The defendant has filed a general demurrer to each count, and the court has very carefully considered the questions of law thereby raised. They are interesting and important, though not altogether new.

The seventeenth clause of section 8, art. 1, of the Constitution of the United States, provides that the Congress shall have power "to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square), as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

For the purposes of this case, that provision would be expressed with perfect accuracy in this language, viz.: "The Congress shall have power to exercise exclusive legislation in all cases whatsoever over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

Assuming, in the consideration of the demurrer, that the averments of the indictment are true, it appears that the "place" where the criminal acts are alleged to have been committed by the accused was on land then used for public governmental purposes; that the state's interest in the land had been ceded to the United States by the Legislature of Kentucky under an act approved February 20, 1886 (1 Sess. Acts 1885–86, p. 11, c. 69); and that in addition to this the Legislature of the state had, by the same enactment, in express terms, yielded to the United States jurisdiction over it. As this court must take notice of all laws, state and national, it judicially knows that the state of Kentucky by this legislation ceded the land to the United States; that it is the same land which the state had leased to the Green &

Barren River Navigation Company by an act for the purpose approved March 9, 1868 (2 Sess. Acts 1867–68, p. 599, c. 1165); and that the state had, by the act first above mentioned, authorized and consented to the purchase by the government of the interest of all other persons in the property (see 1 Sess. Acts 1885–86, p. 11, c. 69).

The United States afterwards purchased the property of the Green & Barren River Navigation Company, including its interest in the land, under the provisions of the act of August 11, 1888, making appropriations for rivers and harbors (25 Stat. 416), and by this purchase, and the cession of the state of Kentucky under the act of February 20, 1886, the United States became the sole owner of the place in question and the structures thereon. Afterwards, by the act approved August 16, 1892, which is now embraced in the Kentucky Statutes as section 2376, the state of Kentucky enacted legislation as follows:

"That the commonwealth of Kentucky hereby consents to the acquisition by the United States of America of all lands and appurtenances in this commonwealth heretofore legally acquired, or that may be hereafter legally acquired, by purchase or condemnation, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings, including post-offices, custom-houses and court-houses; also lands for locks, dams and canals in improving the navigation of the rivers and waters within and on the borders of the commonwealth of Kentucky."

1. It seems to the court that the power of Congress to exercise "exclusive legislation" over the "place" described in the indictment in this case is plainly deducible from the constitutional provision above quoted, when we assume to be true three essential facts stated in the indictment, viz.: First, that the United States purchased the place in question; second, that this was done with the consent of the legislature of Kentucky; and, third, that the place was used for the public governmental purposes described in the indictment. If those three facts coexist, the plainly expressed constitutional provision, of its own force, gives Congress the power of exclusive legislation over that "place."

2. I think the ceding of the land by the state probably constituted a "purchase" thereof by the United States, in the broad sense of that word. Bouvier's Law Dictionary. If, however, there was not, in the technical sense, a "purchase," but only a voluntary legislative cession or gift to the United States, not only of the legal title thereto, but also of jurisdiction over it, then, while there might be binding conditions annexed to such a cession, still the act of February 20, 1886, above referred to, is ample to maintain the exclusive right and power of the general government to legislate over the "place" described in the indictment. The only right reserved to the state in the act of cession was that of serving thereon any process that might issue from its courts.

In the opinion of the court, both a purchase with the consent of the state and an express cession of jurisdiction are not necessary to the powers and rights of the government. Either will be sufficient if the place is owned by the United States and is actually used for governmental purposes. In this case, however, we find both.

Where there is a "purchase" of property with the consent of the

state legislature, exclusive jurisdiction follows and attaches by virtue of the constitutional provision itself, while in the case of express cession of jurisdiction to the United States by a legislative enactment for that purpose the jurisdiction of the United States over the place is derived from such legislative act, and not necessarily from the constitutional provision per se. In the various Kansas cases decided by the Supreme Court there was not a purchase by the United States of the place then in question (a government reservation) with the consent of the state of Kansas, because the United States had acquired title to all the vacant land in the territory of Kansas by the Louisiana Purchase, in 1803, over half a century before the state was created, in 1861. The land in question in those cases, the legal title to which was in the United States, was reserved from public sale and retained for governmental uses. But the state of Kansas, after its admission into the Union, did, by express legislation, cede jurisdiction over it, and this, coupled with ownership and use, was treated as entirely sufficient to bring it within the exclusive jurisdiction of Congress.

The authorities which clearly establish these general propositions are those of Ft. Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264; Chicago, R. I. & Pacific R. R. Co. v. McGlinn, 114 U. S. 542, 5 Sup. Ct. 1005, 29 L. Ed. 270; Benson v. United States, 146 U. S. 330, 13 Sup. Ct. 60, 36 L. Ed. 991; Palmer v. Barrett, 162 U. S. 402, 16 Sup. Ct. 837, 40 L. Ed. 1015; United States v. Cornell, 2 Mason, 60, Fed. Cas. No. 14,867; Sharon v. Hill (C. C.) 24 Fed. 729; Martin v. House (C. C.) 39 Fed. 694; Bannon v. Burnes (C. C.) 39 Fed. 899; In re Ladd (C. C.) 74 Fed. 31; State v. Mack, 23 Nev. 359, 47 Pac. 763, 62 Am. St. Rep. 811; Foley v. Shriver, 81 Va. 572; 1 Story on Constitution, §§ 1216–1229.

It may be useful to repeat at this point two observations of the Supreme Court in the case first above cited from 114 U. S., 5 Sup. Ct., 29 L. Ed. At page 532 of the report (page 999, 5 Sup. Ct., and 29 L. Ed. 264) is found this language:

"When the title is acquired by purchase by consent of the legislatures of the states, the federal jurisdiction is exclusive of all state authority. This follows from the declaration of the Constitution that Congress shall have 'like authority' over such places as it has over the district which is the seat of government; that is, the power of 'exclusive legislation in all cases whatsoever.' Broader or clearer language could not be used to exclude all other authority than that of Congress; and that no other authority can be exercised over them has been the uniform opinion of federal and state tribunals, and of attorneys general."

On page 539, 114 U. S., page 1002, 5 Sup. Ct., and 29 L. Ed. 264, the court further said:

"Where, therefore, lands are acquired in any other way by the United States within the limits of a state than by purchase with her consent, they will hold the lands subject to this qualification: that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed. Such is the law with reference to all instrumentalities created by the general government. Their exemption from state control is essential to the independence and sovereign authority of the United States within the

sphere of their delegated powers. But, when not used as such instrumentalities, the legislative power of the state over the places acquired will be as full and complete as over any other places within her limits."

It is, indeed, most essential for many public purposes (as it was in the case of the District of Columbia) that the United States shall have and own numerous places upon which to conduct the vast business of the government, and it would be folly to expect the best results if any other power could exercise a conflicting and possibly an annoying and interfering authority over those places. Luckily, this was demonstrated to be the case at a period just before the completion of the draft of the Constitution of the United States, when a mob of mutineers from the Continental Army assembled around the place where the Congress sat in Philadelphia at the time, and consequently clause 17 of section 8 was at once framed and inserted in the draft of the Constitution before its final adoption by the convention. The exclusive power to legislate over places where the great affairs of the government are conducted was therefore most wisely committed to the Congress. The interests involved are national, and all legislation affecting them should be by national, and not by mere local, authority.

It may not be amiss to observe that although the act of August 16, 1892 (now section 2376 of the Kentucky Statutes of 1899), was not passed until some years after the United States had acquired the land described in the indictment, still the consent of the state to the purchase was thereby and then in fact given, and was at least sufficient as to all offenses committed on such place after such consent, and was therefore sufficient for the purposes of this case, if nothing else appeared.

3. While there might possibly be some difficulty (under the rule ejusdem generis) if the question were res integra, as to the strictly proper construction and applicability to the case of locks and dams of the words, "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings," used in the clause of the Constitution above quoted, the cases seem to leave no doubt that the broadest construction has been wisely put upon that language—one which makes it cover all structures and all places necessary for carrying on the business of the national government.

4. If we have established the proposition that either the purchase of the "place" with the consent of the legislature of the state or the express cession by the state to the United States of jurisdiction is sufficient to give Congress the power of "exclusive legislation" over it, then the provisions of section 5391 of the Revised Statutes [U. S. Comp. St. 1901, p. 3651], which is an attempt to exercise that power, will be enforceable in this instance. That section is as follows:

"If any offense be committed in any place which has been or may hereafter be, ceded to and under the jurisdiction of the United States, which offense is not prohibited, or the punishment thereof is not specially provided for, by any law of the United States, such offense shall be liable to, and receive, the same punishment as the laws of the state in which such place is situated, now in force, provide for the like offense when committed within the jurisdiction of such state; and no subsequent repeal of any such state law shall affect any prosecution for such offense in any court of the United States."

It is insisted, however, that those provisions are merely the act of 1825, and that the words "now in force" must lead to sustaining the demurrer, because it is insisted that at the time of passing the act of 1825 no law of Kentucky was in force which made such acts punishable as are alleged to have been committed by the accused. It seems to the court that this contention involves the overlooking of the provisions of sections 5595 and 5596 of the Revised Statutes [U. S. Comp. St. 1901, p. 3751], which are as follows:

"Sec. 5595. The foregoing seventy-three titles embrace the statutes of the United States general and permanent in their nature, in force on the 1st day of December one thousand eight hundred and seventy-three, as revised and consolidated by commissioners appointed under an act of Congress, and the same shall be designated and cited, as The Revised Statutes of the United States.

"Sec. 5596. All acts of Congress passed prior to said first day of December one thousand eight hundred and seventy-three, any portion of which is embraced in any section of said revision, are hereby repealed, and the section applicable thereto shall be in force in lieu thereof; all parts of such acts not contained in such revision, having been repealed or superseded by subsequent acts, or not being general and permanent in their nature: provided, that the incorporation into said revision of any general and permanent provision, taken from an act making appropriations, or from an act containing other provisions of a private, local, or temporary character, shall not repeal, or in any way affect any appropriation, or any provision of a private, local or temporary character, contained in any of said acts, but the same shall remain in force; and all acts of Congress passed prior to said last-named day no part of which are embraced in said revision, shall not be affected or changed by its enactment."

These provisions would seem to re-enact the act of 1825, and to enact section 5391 in 1878, when the Revised Statutes were adopted by Congress. But, independently of those two sections, the law as embodied in section 5391, Rev. St., would not necessarily or properly reach back to 1825, for by the second section of the act of April 5, 1866 (14 Stat. 13), it is provided—

"That if any offense shall be committed in any place which has been, or shall hereafter be, ceded to, and under the jurisdiction of the United States, which offense is not prohibited, or the punishment thereof is not specially provided for by any law of the United States, such offense shall, upon conviction in any court of the United States having cognizance thereof, be liable to, and receive the same punishment as the laws of the state in which such place is, or may be situated, now in force, provided for the like offense when committed within the jurisdiction of such state; and no subsequent repeal of any such state law shall affect any prosecution for such offense in any of the courts of the United States."

It would thus appear that the enactment of section 5391 need not be referred to an earlier date than April 5, 1866, if, indeed, we should go back further than 1878 for the date as to which we should construe the words "now in force," used in section 5391.

Certainly in 1866, and in 1873 and 1878, and, indeed, possibly in 1825, there were statutes in force in Kentucky which amply provided for the punishment, by prescribed penalties, of either of the offenses charged in the indictment.

Considering the offense charged in the first count, viz., that the accused "did unlawfully, willfully and feloniously, and with malice aforethought, cut, strike and stab one John L. Ewing with a knife with

intention to kill him, the said Ewing, but from the wound so inflicted the said Ewing did not die," we find that the following statutes of Kentucky were in full force on April 5, 1866, and have been ever since, and they, in practically the same language, describe the offense as it is described in this count: 1 Stanton's Rev. St. Ky. p. 382, art. 6, § 2; 3 Littell's Laws Ky. p. 67, c. 34, § 13; 2 Morehead & Brown, p. 1281, § 13; Ky. St. 1899, § 1166; Gen. St. Ky. p. 412, c. 29, art. 6, § 2.

The sufficiency of the form of the first count in this respect is upheld by the opinion of the Court of Appeals in the case of Gratz v. The Commonwealth, 96 Ky. 162, 28 S. W. 159.

Considering in the same way the offense charged in the second count of the indictment, viz., that the accused "did willfully and unlawfully, in sudden heat and passion, and not in self-defense, cut, stab and wound one John L. Ewing without killing him," we need only refer to the following statutes of Kentucky, which were also in force on April 5, 1866, and in 1873 and 1878, and ever since, and which define the offense charged in language similar to that used in this count: Ky. St. 1899, § 1242; 2 Morehead & Brown, p. 1301; 1 Stanton's Rev. St. Ky. p. 397; Gen. St. p. 435, c. 29, art. 17, § 1.

For reasons thus sufficiently indicated the demurrer to the indictment would seem to be unavailing, and it is therefore overruled.