UNITED STATES of America,
Appellant,

v.

Franklin Dale GOINGS and Seth Peter
Bad Cob, Appellees.

No. 74–1164.

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1974.

Decided Oct. 16, 1974.

Glen R. Goodsell, Atty., Dept of Justice, Washington, D.C., for appellant.

William C. Kelsch, Mandan, N.D., for appellees.

Before LAY, HEANEY and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

The issue presented on appeal is whether the United States retained exclusive jurisdiction over one hundred five acres of the Fort Lincoln Military Reservation after it transferred that acreage by quit claim deed to United Tribes of North Dakota Development Corporation. The deed contained several conditions subsequent[1] and a covenant reserving in the United States the full and unrestricted control, possession and use of the property conveyed in times of emergency.[2] The trial court held that notwithstanding these conditions, the United States had divested itself of all interest in the lands conveyed and had terminated its exclusive jurisdiction. We affirm.

Prior to May 24, 1973, the United States had exclusive jurisdiction over the entire Fort Lincoln Military Reservation in Burleigh County, North Dakota. *See,* United States v. Redstone, 488 F.2d 300 (8th Cir. 1973). On that date, the federal government transferred by deed, pursuant to the power and authority contained in the Federal Property and Administrative Services Act of 1949, as amended, one hundred five acres of Fort Lincoln to United Tribes of North Dakota Development Corporation.[3] United Tribes is a private nonprofit North Dakota corporation. The lands it acquired lie between federal property used by the General Services Administration and the United States Army Reserve; these together constitute Fort Lincoln.

On October 27, 1973, Franklin Dale Goings and Seth Peter Bad Cob allegedly assaulted Robert J. Slominiski on the land owned by United Tribes. The United States filed an information charging the defendants with assault within "the special * * * territorial jurisdiction of the United States," in violation of 18 U.S.C. § 113(c).[4] On mo-

---

[1]. The deed is set forth in full in the trial court's opinion reported at 372 F.Supp. 811 (D.N.D.1974). Briefly, the conditions require: (1) that for a period of thirty years, the property will be used continuously for educational purposes; (2) that during the first thirty years, the Grantee will not encumber, hypothecate, lease, mortgage, resell or otherwise dispose of the property with the consent of the United States; (3) that during the first thirty years, the Grantee will file periodic reports on the operation and maintenance of the property; (4) that during any period in which financial assistance is extended, the Grantee will comply with the Civil Rights Act of 1964, and the regulations imposed thereunder; and (5) that during any period in which financial assistance is extended, the Grantee will comply with the provisions of the National Environmental Policy Act of 1969.

[2]. The covenant requires that the emergency be declared by the President of the United States or by the Congress of the United States. It further provides that if the reserved right to use is exercised within the first thirty years, the Grantor will (1) bear the cost of maintenance of the property used exclusively, (2) pay a fair share of the cost of maintenance of the property used nonexclusively, (3) pay a fair rent for the use of improvements made by the Grantee without Government aid, and (4) be responsible for any damage to the property caused by its use, reasonable wear and tear and acts of God and the common enemy excepted. If the reserved right to use is exercised after the first thirty years, the Grantor, in addition to the above, will pay a fair rent for the property used.

[3]. The deed declared the property conveyed to be surplus to the needs of the Grantor. "Surplus property" is defined in 40 U.S.C. § 472(g) to be " *. * * any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies * * *."

[4]. 18 U.S.C. § 113(c) reads:
Whoever, within the special * * * territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:
* * * * *
(c) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine of not more than $1,000 or imprisonment for not more than five years, or both.
The "special territorial jurisdiction" is defined in 18 U.S.C. § 7(3):
The term "special * * * territorial jurisdiction of the United States", as used in this title, includes:
* * * * *
(3) Any lands reserved or acquired for the use of the United States, and under

tion by the defense, the United States District Court for the District of North Dakota ruled that the United States had divested itself of exclusive jurisdiction and dismissed the criminal complaints.

The trial court held that the deed conveyed a fee simple subject to conditions subsequent. No interest in the land remained in the United States. The United States retained only a chose-in-action, requiring affirmative steps to retake the land, which could not, the court reasoned, be the basis for exclusive jurisdiction.

The trial court further held that the reserved right to use of the land conveyed during periods of emergency was only a declaration of procedure to facilitate the government's preexistent power of eminent domain. It was not a continuing interest in the land upon which exclusive jurisdiction could be predicated.

■ The property in question was acquired by the United States for a fort in 1898, the State of North Dakota having given its consent to the purchase some three years earlier. N.D.C.C. § 54–01–07.[5] As a result of the acquisition with consent, the Congress of the United States had the "power to exercise exclusive Legislation" over the acquired lands. *See,* Article I, Section 8, Clause 17 of the United States Constitution.[6] This right is equivalent to exclusive jurisdiction. Surplus Trading Co. v. Cook, 281 U.S. 647, 652, 50 S.Ct. 455, 74 L.Ed. 1091 (1930). The purpose of Clause 17 is well stated in United States v. Tucker, 122 F. 518 (6th Cir. 1903):

> the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

5. The statute parallels, in all relevant respects, Article I, Section 8, Clause 17 of the United States Constitution. The effect of state consent with reservations is, therefore, not here presented. It is settled, however, that the state consent can be more restric-

It is, indeed, most essential for many public purposes (as it was in the case of the District of Columbia) that the United States shall have and own numerous places upon which to conduct the vast business of the government, and it would be folly to expect the best results if any other power could exercise a conflicting and possibly an annoying and interfering authority over those places. Luckily, this was demonstrated to be the case at a period just before the completion of the draft of the Constitution of the United States [.] * * * The interests involved are national, and all legislation affecting them should be by national, and not by mere local, authority.

*Id.* at 522.

■ The sovereignty of the United States over property acquired pursuant to Clause 17 ends with the reasons for the existence of the power and the disposition of the property. S.R.A. v. Minnesota, 327 U.S. 558, 564, 66 S.Ct. 749, 90 L.Ed. 851 (1946); *cf.,* Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525, 542, 5 S.Ct. 995, 29 L.Ed.2d 264 (1885); LaDuke v. Melin, 45 N.D. 349, 177 N.W. 673 (1920).

■ Here, the reasons for the existence of the power are no longer present. The purchaser, United Tribes, is a private enterprise which owns and uses the land exclusively for educational purposes. The conditions subsequent imposed by the United States did no more than insure that the sale was in accordance with the statutory authoriza-

tive than Clause 17. James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937); Silas Mason Co. v. Tax Comm'n, 302 U.S. 186, 58 S.Ct. 233, 82 L. Ed. 187 (1937).

6. Clause 17 reads in relevant part:
   The Congress shall have Power * * * To exercise exclusive Legislation * * * over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts * * * and other needful buildings[.]

tion for the disposal of federal lands.[7] No federal function is performed and no continuing federal involvement in the lands is maintained.

■ The more difficult question, however, is whether the United States has disposed of the property to United Tribes in a manner sufficient to divest it of exclusive jurisdiction.[8] To put the question differently, does the covenant reserving in the United States the right to use during periods of emergency require a holding that exclusive jurisdiction was not relinquished? It is settled that more than private use of the lands is necessary to revest jurisdiction in the State. Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964); Arlington Hotel Co. v. Fant, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447 (1929); Benson v. United States, 146 U.S. 325, 13 S.Ct. 60, 36 L. Ed. 991 (1892); United States v. Redstone, supra. In addition, the land must no longer be under the ultimate control of the federal government ready for use when needed for the military purposes for which it was dedicated. See, Humble Pipe Line Co. v. Waggonner, supra, 376 U.S. at 372, 84 S.Ct. 857; Benson v. United States, supra, 146 U.S. at 331, 13 S.Ct. 60.

Whether the United States will ever exercise the reserved right to use the lands during periods of emergency is a contingency too remote for prediction. Its exercise, however, will make the United States the lessee of United Tribes.[9] The sale transferred to United Tribes ultimate control over the lands and recognizes that any use by the United States is temporary. We agree with the trial court's holding that this covenant is a declaration of procedure to facilitate the government's power of eminent domain. The United States no longer holds the property intact dedicated to the purposes and objects of Clause 17. Jurisdiction must revert to the State.

We realize, in affirming the decision of the trial court, that checkerboard jurisdiction results within the confines of Fort Lincoln. But this should pose no problem in that the existence of Fort Lincoln itself creates checkerboard jurisdiction. Furthermore, the lands, now being part of North Dakota, will be subject to and benefit from a complete body of state law. No longer will the federal law, incomplete in the regulation of private activity, be the sole source of order.[10]

Affirmed.

---

7. See, 40 U.S.C. § 484(k).

8. 10 U.S.C. § 2683 provides that the Secretary of a military department may relinquish to a State the legislative jurisdiction of the United States over lands or interests under his control in that State. Had the United States taken advantage of this statute, the problem presented here could have been obviated.

9. See, note 2, supra.

10. See, Note, Federal Areas: The Confusion of a Jurisdictional-Geographical Dichotomy, 101 U.Pa.L.Rev. 124 (1952) (review of the anomalous status of federal enclave residents who live within a state without being residents thereof and the incomplete ameliorative legislation of Congress); see also, Murray v. Gerrick & Co., 291 U.S. 315, 54 S.Ct. 432, 78 L.Ed. 821 (1934).